ATTORNEYS FOR APPELLANT
Latasha R. Roberts
Adam Lenkowsky
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ryan D. Johanningsmeier
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



No. 20S03-1303-CR-158

PATRICK AUSTIN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Elkhart Superior Court, No. 20D03-1105-FA-8
The Honorable George Biddlecome, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 20A03-1112-CR-588

**November 15, 2013**

**David, Justice.**

Today we examine the bounds of acceptable police procedure in attempting to interdict interstate narcotics shipments under the Indiana Constitution, and also elaborate on the application of Indiana's Rules of Criminal Procedure providing for a speedy trial.

In this case, a truck driver was arrested after a deliberate operation conducted by the Indiana State Police uncovered a large quantity of cocaine in the truck driver's cargo. He requested a speedy trial, and when the trial court was unable to bring him to trial within the time limit because of court congestion he sought to be discharged from pre-trial incarceration. We find no error in the police action or in the continuance of the defendant's trial, and therefore affirm the trial court.

## Facts and Procedural History

On April 28, 2011, Indiana State Trooper Joseph White was patrolling the Indiana State Toll Road in Porter County when he observed a semi-truck, driven by Patrick Austin, towing a trailer that Trooper White believed would normally be towed by a pickup truck. Concerned by the configuration, Trooper White initiated a traffic stop to perform an inspection of Austin's truck and credentials.[1]

Austin produced his driver's license, medical card, shipping papers, logbook, and permits for the truck and trailer. Upon inspecting the materials, Trooper White noted that Austin's logbook indicated he had been off work for seven days prior to beginning his current assignment and also that his destination was in Illinois but he was travelling east through Indiana. Additionally, Austin's logbook and bills of lading indicated that he had begun his trip in California, carrying three vehicles—a Ford Mustang, a Rolls-Royce, and a Mercedes Benz—but the shipping papers were incomplete, with incomplete shipper names and blanks for the dates on which he had picked up his cargo. And when Trooper White questioned Austin about the blank

_____

[1] Trooper White was certified as a Level III inspector by the Department of Transportation, authorizing him to inspect commercial motor vehicle logbooks and shipping paperwork. Discrepancies in these materials can be relevant in commercial vehicle interdiction operations.

pick-up dates, Austin filled the blanks in with dates in the future. Trooper White then asked Austin where he was going, and Austin indicated that he was going to a trailer parts store in Elkhart, Indiana, but did not know the name or address of the store nor was the store noted as a destination in Austin's logbook or bills of lading.

These collective discrepancies caused Trooper White some concern, based on his training in commercial vehicle interdiction. He then contacted the El Paso Intelligence Center (EPIC), a national intelligence center run by the Drug Enforcement Administration that tracks data on narcotics trafficking, and ran Austin's name through the EPIC system. EPIC informed Trooper White that in 2009, Austin had been involved in a bulk-cash seizure of a million dollars in Michigan, in which he was pulling the same trailer with the same semi-truck. Trooper White asked Austin for consent to search the semi-truck and trailer, and Austin refused. Trooper White then told Austin that he was free to leave and Austin continued east. The total stop took around forty-five minutes.

Trooper White relayed his concerns about Austin to Detective John Dupont of the Indiana State Police and then headed west to complete paperwork and finish his shift. Dupont called Indiana State Trooper Mick Dockery, a senior canine handler and Level III inspector, and asked him to wait for Austin farther east on the Toll Road. With Trooper Dockery at the time was his canine partner, Hondo.

Additional surveillance officers were following Austin from the first traffic stop and relaying updates to Trooper Dockery. When those surveillance officers told Trooper Dockery that Austin was moving past his location, Trooper Dockery pulled onto the Toll Road and began following Austin's vehicle. He observed Austin commit two traffic violations—failing to signal for a full three hundred feet before changing lanes and following too closely—and initiated a traffic stop.

Trooper Dockery inspected Austin's logbook and bills of lading. He noted that Trooper White's traffic stop was not logged in the logbook. He also noted the seven-day absence from

3

work prior to Austin beginning his trip, that the bills of lading were handwritten and indicated pick-up dates in the future, and that Austin's Department of Transportation number was very high.[2] Based on those concerns and the information he had received earlier, Trooper Dockery asked Austin to exit his vehicle so he could perform an exterior search of the truck and trailer using his canine. Hondo alerted to the driver's side door of the truck cab and the rear door of the trailer, indicating the presence of narcotics.

Trooper Dockery then opened the rear gate of the trailer and deployed Hondo inside, where the Mercedes Benz and Rolls-Royce vehicles were stored. Hondo alerted at the rear bumper of the Rolls-Royce.[3] Trooper Dockery and other officers on-scene then obtained a search warrant to search the semi-truck, trailer, and the two cars inside. Inside the truck cab and its sleeper berth, officers found a number of latex gloves, hotel room keycards, and about a half-dozen air fresheners. No narcotics were found inside the cab or sleeper berth, but in the trunk of the Mercedes—inside a hidden compartment—were twenty-nine bricks of cocaine. An additional eleven bricks of cocaine were found in a suitcase inside the Rolls-Royce. The aggregate amount was forty kilos, or roughly ninety pounds, of cocaine. Austin was charged with two counts of dealing in cocaine, both as class A felonies due to the amount of cocaine involved. Ind. Code § 35-48-4-1(a)(2)(c)–1(b)(1) (2008).

---

[2] According to Trooper Dockery, the Department of Transportation assigns a number to companies involved in commercial motor vehicle transportation. Based on his experience and training in commercial vehicle interdiction, Trooper Dockery knew that a legitimate, successful company would not change their DOT number and it would therefore be low—a higher number, though, might be an indicator that the company had been involved in illegal activity in the past, changed names, and been assigned a new (and higher) number.

[3] Because of how the cars were parked inside the trailer, Hondo was unable to reach the back of the Mercedes until it was unloaded. Later, when the cars had been taken off the trailer as part of an extensive search, he alerted at the rear bumper of the Mercedes as well.

On June 6, 2011, Austin filed a request for a speedy trial and the trial court scheduled Austin's case for an August 8 trial date. The State later filed a motion to continue Austin's trial because of court congestion. Over Austin's objection, the trial court granted the State's motion and reset Austin's trial for September 26. Austin then filed a motion for discharge pursuant to Indiana Criminal Rule 4(B), which the trial court denied.

Austin also moved to suppress the evidence obtained as a result of the traffic stop, arguing that it was obtained in violation of both the U.S. and Indiana Constitutions. The trial court denied his motion to suppress, concluding that Trooper Dockery's stop was a separate and distinct stop from Trooper White's, was lawful because it resulted from two traffic violations, and that the subsequent canine sweep did not change the character of that stop. Austin properly renewed his objection at trial when the evidence obtained as a result of the traffic stop was admitted. Ultimately, Austin was convicted on both counts and received a forty-year sentence for each, to be served concurrently.

Austin appealed on a number of fronts.[4] The Court of Appeals affirmed. Austin v. State, 980 N.E.2d 429 (Ind. Ct. App. 2012). We granted transfer to address the police actions leading to the discovery of the cocaine in Austin's trailer and the application of Criminal Rule 4(B), and summarily affirm the Court of Appeals in all other respects. Ind. Appellate Rule 58(A)(2).

---

[4] He claimed he had been denied his right to a speedy trial; that the cocaine seized from the Rolls-Royce and Mercedes was obtained as a result of a constitutionally defective search; that the trial court improperly admitted evidence that Austin had been travelling previously with the same Rolls-Royce; that the jury was improperly instructed as to the burden of proof; and that the trial court abused its discretion at sentencing by considering improper factors and not properly weighing the aggravating and mitigating factors.

## I.        The Search of Austin's Vehicle

On appeal, Austin appears to have dropped his argument that his Fourth Amendment rights were violated and presents only a violation of Article 1, § 11 of the Indiana Constitution. While both provisions preserve the right of people to be secure in their persons, houses, papers, and effects, from unreasonable search and seizure, U.S. Const. amend. IV; Ind. Const. art. 1, § 11, they are analyzed independently and differently. Duran v. State, 930 N.E.2d 10, 17 (Ind. 2010); Mitchell v. State, 745 N.E.2d 775, 785–86 (Ind. 2001).

Fourth Amendment analysis keys on a criminal defendant's expectation of privacy, but under Article 1, § 11 of the Indiana Constitution "'we focus on the actions of the police officer,' and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." Duran, 930 N.E.2d at 17 (quoting Trimble v. State, 842 N.E.2d 798, 803 (Ind. 2006)). In doing so we balance "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." Id. at 17–18 (quoting Litchfield v. State, 824 N.E.2d 356, 361 (Ind. 2005)). It is the State's burden to show that its intrusion into "those areas of life that Hoosiers regard as private" was reasonable under the totality of the circumstances. State v. Quirk, 842 N.E.2d 334, 339–40 (Ind. 2006).

It is unequivocal under our jurisprudence that even a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle. Quirk, 842 N.E.2d at 340. Moreover, Austin concedes that a reasonable narcotics dog sweep is not a search for the purposes of the Fourth Amendment or Article 1, § 11. See Wilson v. State, 847 N.E.2d 1064, 1067 (Ind. Ct. App. 2006) (citing Myers v. State, 839 N.E.2d 1146 (Ind. 2005)). However, such a sweep is an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity. See Quirk, 842 N.E.2d at 340; Mitchell, 745 N.E.2d at 788.

6

Austin does not contest that he failed to properly signal a lane change and followed a vehicle too closely. He therefore does not (and cannot) contest that Trooper Dockery had probable cause to pull him over for those traffic violations.[5] Rather, Austin appears to present a multi-faceted claim: that Trooper Dockery lacked reasonable suspicion to detain Austin past citing him for the traffic violations, and that Trooper Dockery's traffic stop was a pretextual continuation of a search that ended when Trooper White allowed Austin to drive away. Applying the Litchfield factors here tells us he is incorrect on both counts.

First, the degree of concern, suspicion, or knowledge was significant. Trooper Dockery noted that Austin was nervous. He also saw that Austin's logbook did not reflect the prior traffic stop and appeared to indicate an out-of-the-ordinary gap in driving time, both things he found suspicious and potential indicators of illicit activity. He also was concerned because of Austin's high DOT number and the handwritten, inaccurate bills of lading. All of these things, based on his training as a narcotics interdiction officer, were indicators of Austin's potential participation in drug smuggling. Moreover, he was aware of Trooper White's independent suspicions, and was also aware of the results of the EPIC query—specifically, that Austin had been involved in a bulk-cash seizure in Michigan while driving the same truck and trailer.

Though these indicators may pass unnoticed to the average person, and may in fact constitute innocent mistakes in some cases, "[w]e acknowledge that conduct, which would be wholly innocent to the untrained observer, might acquire significance when viewed by an officer who is familiar with the practices of drug smugglers and the methods used to avoid detection." Quirk, 842 N.E.2d at 343.

---

[5] Nor does he contest the assertion that as a Level III DOT inspector, Trooper Dockery could pull Austin over to inspect his shipping paperwork absent any traffic violations at all.

Austin is correct that in Quirk this Court looked at somewhat similar facts and reached a different result. Quirk, 842 N.E.2d at 340–41 (defendant demonstrated nervous behavior, had handwritten bill of lading, had used aliases in the past, had criminal history including transporting controlled substance, lied about his criminal history, and had driver's license issued from narcotics-source state). Many of those facts, though, were not shown in the record to have aroused police suspicion or were not relied upon by the trial court. See id. at 338–39, 341. We therefore found that such a "combination of irrelevant conduct and innocent conduct, *without more*, cannot be transformed into a suspicious conglomeration." Id. at 343 (emphasis added). But at least two things distinguish Austin's case from Quirk.

For one thing, here we see the "more" that was lacking in Quirk. For example, it was not simply that Austin's bills of lading were handwritten that was suspicious—it was that they were incomplete and, when completed, were done in a way that indicated Austin was simply filling in dates at random. There were also gaps in his travel time, and Trooper White's stop was omitted entirely. Also, Austin claimed to be going to Elkhart to pick up truck parts but could not identify where the parts store was, what it was called, or whether it was open. See id. at 342 ("[A]n inconsistent answer regarding past conduct is less suspicious than an inconsistent answer regarding present destination or purpose. . . . the latter casts suspicion and doubt on the nature and legitimacy of the activity being investigated.") (quoting United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001)). And finally, the results of the EPIC query—the same driver, the same truck, and the same trailer, hauling a million dollars in cash two years earlier—is much more significant than Quirk's criminal history, which was thirteen years or more in his past. Id. at 341–42.

And second, though we did not need to resolve Quirk with an explicit analysis of each of the Litchfield factors, it is clear that the second factor—the degree of the State intrusion on the citizen's ordinary activity—was far greater in Quirk than here. In Quirk, the defendant was pulled over for a traffic violation, asked about his aliases and criminal history, and then received a ticket for the violation and was told he was free to leave. Immediately thereafter, however, he was called back to a patrol car and questioned about whether he was carrying illegal substances.

8

Quirk answered that he was not and consented to a search of his trailer, which revealed only lettuce. Quirk was then allowed to leave and drove to a nearby rest area where he got out of his truck and went to use the restroom. Officers followed Quirk to the rest area and called for a narcotics dog. When Quirk exited the restroom the officers told him he was free to leave, but that they were detaining the truck. Twenty minutes later a canine officer arrived and conducted a sweep that revealed narcotics in the cabin of the truck.

So Quirk was detained for long enough to complete the officer's work on the traffic violation, told he was free to go, then detained again for reasons unrelated to the traffic violation, then released again. He was then followed and effectively detained a third time for an additional twenty minutes while a canine was brought to the scene. That is a far cry from what we see here.

Here Austin's initial traffic stop was forty-five minutes long, but that was consistent with Trooper White conducting his Level III DOT inspection. After that, he was told he was free to leave—and he was. He was not detained further at the initial stop; he was sent on his way. He was followed like Quirk, but Austin was not intercepted at a rest stop and blocked from returning to his truck while a canine officer was requested. Instead Trooper Dockery—accompanied by Hondo—waited farther up the Toll Road and did not pull Austin over until Austin committed not one, but two traffic violations. In the course of the stop for those violations, after independently confirming Trooper White's suspicions, Trooper Dockery and Hondo conducted a sweep of the exterior of Austin's truck that resulted in an alert for narcotics.

The State Police did not close the exits from the Toll Road; they did not bar Austin from leaving the initial traffic stop; nor did they prevent him from proceeding in any direction he pleased from that point forward. That he continued on the Toll Road past Trooper Dockery may or may not have been the predictable outcome, but his commission of the traffic violations was

an act of his own doing.[6] And given the near-immediacy of Hondo's sweep from that point, we cannot say that the degree of police intrusion into Austin's ordinary activities was anything but minimal.

Finally, we recognize that law enforcement needs in this arena are great. Intra- and international drug trafficking are significant issues facing law enforcement and public safety officials at the federal, state, and local levels. The individuals and organizations engaged in these criminal activities run the gamut from individual operators to large-scale, corporate-like organizations, and they are not stupid—they are sophisticated and adaptive to changes in law enforcement methods. And given that their stock-in-trade is inherently fungible and highly mobile, but their centers of organization are scattered and secretive, law enforcement's best chance of uncovering the latter is to interdict the former as it moves about our nation's highways. Nowhere, perhaps, is that more important than in a state known as "The Crossroads of America."

We therefore conclude that neither Trooper White's nor Trooper Dockery's detentions of Austin—nor the collective police action—constituted an unreasonable search or seizure under Article 1, § 11 of the Indiana Constitution. In point of fact, whether by intention or by coincidence we think this particular police operation exemplifies the balance between pursuing the law enforcement aim and protecting the constitutional rights of the suspect that the Indiana Constitution compels. The officers here noticed things that their training told them were indicators of drug trafficking, but they did not indefinitely hold Austin while they confirmed those suspicions. Instead they let him go, while coordinating to put the assets they needed in a place where they would be useful, and waited until they had an independent—and

---

[6] It is irrelevant whether Trooper Dockery's stop was also motivated by the State Police's suspicions concerning Austin. As we said in Mitchell, "[w]e find nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity by the motorist, to nevertheless respond to an observed traffic violation. It is likewise not unreasonable for a motorist who commits a traffic law violation to be subject to accountability for said violation even if the officer may have an ulterior motive of furthering an unrelated criminal investigation." 745 N.E.2d at 787.

constitutionally valid—reason to stop Austin again. And once he was stopped again they re-confirmed their earlier suspicions and promptly validated them by use of a trained narcotics dog. The end result was the discovery and seizure of nearly ninety pounds of cocaine hidden in a vehicle transiting our state, and also the proper admission of that evidence at Austin's trial.

## II.     Austin's Criminal Rule 4 Motions

The broad goal of Indiana's Criminal Rule 4 is to provide functionality to a criminal defendant's fundamental and constitutionally protected right to a speedy trial.[7] Cundiff v. State, 967 N.E.2d 1026, 1027 (Ind. 2012); see also U.S. Const. amend. VI; Ind. Const. art. 1, § 12. It places an affirmative duty on the State to bring the defendant to trial, but at the same time is not intended to be a mechanism for providing defendants a technical means to escape prosecution. Cundiff, 967 N.E.2d at 1028 (citing Curtis v. State, 948 N.E.2d 1143, 1151 (Ind. 2011) and Loyd v. State, 272 Ind. 404, 410, 398 N.E.2d 1260, 1266 (1980)).

Subsection B of Criminal Rule 4 provides that "[i]f any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion." Ind. Crim. Rule 4(B)(1). Exceptions to this requirement include where the defendant seeks a continuance or the delay is otherwise the result of the defendant's conduct, "or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar." Crim. R. 4(B)(1). This latter exception for court congestion generally requires a motion from the

---

[7] Though commonly referred to as the "speedy trial rule," and motions filed thereunder as "motions for a speedy trial," we point out that the rule technically guarantees an "early" trial. Ind. Crim. Rule 4(B). And though Rule 4(B)'s intent is to effectuate the rights guaranteed by the Sixth Amendment to the U.S. Constitution and Article 1, Section 12 of the Indiana Constitution, we emphasize that reviewing Rule 4(B) challenges is separate and distinct from reviewing claimed violations of those constitutional provisions. See Cundiff v. State, 967 N.E.2d 1026, 1027 n.2 (Ind. 2012).

prosecutor, although "a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance." Crim. R. 4(B)(1). "Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time." Crim. R. 4(B)(1).

Thus Criminal Rule 4(B) presents at least three hurdles at the trial court level: First, when a criminal defendant files a motion for a speedy trial, the trial court must set the defendant's case for trial within seventy days—which might require, to an extent we discuss below—a re-prioritization of its current caseload. Second, if the trial court finds it cannot accomplish this prioritization and bring the defendant to trial within seventy days because of court congestion, it may order a continuance—and that finding of congestion is then subject to challenge by way of the defendant's motion for discharge. And third, if the trial court orders such a continuance, it still must keep sight of the defendant's constitutional right to a speedy trial—and Rule 4(B) therefore permits the continuance only to the extent that the defendant proceeds to trial within a reasonable time after the close of the seventy-day window.

Though this is not the first time we have addressed Criminal Rule 4, its precise operation continues to present evolving challenges for both appellate and trial courts. So before we proceed to the merits of Austin's appeal, we first examine the standard of review used by appellate courts assessing denial of a motion for discharge under Criminal Rule 4(B) and the prioritization of civil and criminal cases when a criminal defendant requests a speedy trial.[8]

---

[8] Both Criminal Rules 4(A) and 4(C) also contain language providing for continuances due to a congested calendar or emergency, and for then setting the trial within a reasonable time. We see no reason why the analysis for those issues arising under those rules would—or should—be any different than the analysis under Rule 4(B). Thus, our view is that this opinion's analysis in the context of Criminal Rule 4(B) should apply with equal force to Criminal Rules 4(A) and 4(C).

## A. Criminal Rule 4(B) Standard of Review

The Court of Appeals has noted some confusion about what the standard of review should be in reviewing appeals of Criminal Rule 4 motions. See Upshaw v. State, 934 N.E.2d 178, 181–82 (Ind. Ct. App. 2010). Some panels have reviewed these motions using a de novo standard, id. at 182 (citing Mork v. State, 912 N.E.2d 408, 410 (Ind. Ct. App. 2009) and Bartley v. State, 800 N.E.2d 193, 195 (Ind. Ct. App. 2003)), some have applied an abuse of discretion standard, id. (citing Bowman v. State, 884 N.E.2d 917, 919 (Ind. Ct. App. 2008), trans. denied), and some have applied a clearly erroneous standard, id. (citing Paul v. State, 799 N.E.2d 1194, 1197 (Ind. Ct. App. 2003)). And at least one panel has tried to resolve this apparent conflict by fashioning its own solution. Feuston v. State, 953 N.E.2d 545, 548 (Ind. Ct. App. 2011) ("factual findings made by the trial court are entitled to deference, but legal conclusions are to be reviewed de novo").

For his part, Austin claims the trial court committed an abuse of discretion. The State, though, argues that the trial court's finding of congestion was not clearly erroneous. We believe the State generally presents the correct standard of review.

The de novo approach seems to take its cue from Vaughn v. State, 470 N.E.2d 374 (Ind. Ct. App. 1984). See Bartley, 800 N.E.2d at 195 (citing Kirby v. State, 774 N.E.2d 523, 530 (Ind. Ct. App. 2002), trans. denied); Kirby, 774 N.E.2d at 530 (noting Vaughn "implicitly review[ed] an Ind. Criminal Rule 4(B) question about which party was responsible for a delay under a de novo standard"). The issue in Vaughn, though, was whether the defendant's participation in plea negotiations constituted a delay attributable to him in determining the time limitation for Criminal Rule 4(B). Vaughn, 470 N.E.2d at 377. But that question had already been answered by this Court, and so the Vaughn panel was just applying our precedent as a matter of law. Id. (applying Mickens v. State, 439 N.E.2d 591, 595 (Ind. 1982)); cf. Pelley v. State, 901 N.E.2d 494, 498 (Ind. 2009) (resolving particular Rule 4(C) question "as one of law which we review de novo"). As such, Vaughn may not be the best foundation for extending de novo appellate review to all Criminal Rule 4 questions.

13

The abuse of discretion approach appears to flow at least in part from Johnson v. State, 774 N.E.2d 1012 (Ind. Ct. App. 2002). See Bowman, 884 N.E.2d at 919 (citing Werner v. State, 818 N.E.2d 26, 28 (Ind. Ct. App. 2004), trans. denied); Werner, 818 N.E.2d at 28 (citing Johnson for the proposition that "we review a trial court's denial of a motion to dismiss for an abuse of discretion"). Bowman and Werner, however, were appellate reviews of a trial court's denial of a motion to dismiss under Criminal Rule 4(C), and not 4(B). Bowman, 884 N.E.2d at 919; Werner, 818 N.E.2d at 29. And while that particular distinction may not be terribly significant,[9] Johnson did not involve Criminal Rule 4 at all—it was an appeal from the denial of a motion to dismiss based on an alleged double jeopardy violation. 774 N.E.2d at 1014.

But notwithstanding the relative merits of the de novo and abuse of discretion approaches in those particular cases, the clearly erroneous standard at least has as its origins a recent case from this Court. See Paul, 799 N.E.2d at 1197 (citing Lowrimore v. State, 728 N.E.2d 860 (Ind. 2000)); see also Lowrimore, 728 N.E.2d at 864–65 (citing Clark v. State, 659 N.E.2d 548, 502 (Ind. 1995)). And as it turns out, that case—Clark—is a very good starting point. As then-Justice Dickson wrote:

> Upon appellate review, a trial court's finding of congestion will be presumed valid and need not be contemporaneously explained or documented by the trial court. However, a defendant may challenge that finding, by filing a Motion for Discharge and demonstrating that, at the time the trial court made its decision to postpone trial, the finding of congestion was factually or legally inaccurate. Such proof would be prima facie adequate for discharge, absent further trial court findings explaining the congestion and justifying the continuance. In the appellate review of such a case, the trial court's explanations will be accorded

---

[9] Indiana Criminal Rule 4(C) provides that "[n]o person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later."

reasonable deference, and a defendant must establish his entitlement to relief by showing that the trial court was clearly erroneous.

Clark, 659 N.E.2d at 552. To an extent, we agree with the Court of Appeals in Feuston that much of the division amongst appellate courts has "arisen because sometimes the trial court must resolve disputed facts, but on other occasions simply applies the law to undisputed facts." 953 N.E.2d at 548. And as the Feuston panel's resolution then implies, in cases where the issue is a question of law applied to undisputed facts, the standard of review—like for all questions of law—is de novo. See also Otte v. State, 967 N.E.2d 540, 545 (Ind. Ct. App. 2012) (adopting Feuston approach), trans. denied. And certainly, the ultimate reasonableness of the trial court's findings depends very much upon the facts and circumstances of the particular case. See Wilkins v. State, 901 N.E.2d 535, 537 (Ind. Ct. App. 2009), trans. denied.

But at the same time we reiterate that in those cases where a trial court makes a factual finding of congestion (or emergency, see Lowrimore, 728 N.E.2d at 865) under Criminal Rule 4 based on disputed facts, the standard of review for appellate courts is not abuse of discretion—it is the clearly erroneous standard as we said in Clark.[10] This was the approach generally taken by the Court of Appeals below. See Austin, 980 N.E.2d at 434.

And under this standard, after according the trial court's findings reasonable deference, appellate review is for clear error. State v. Oney, 993 N.E.2d 157, 161 (Ind. 2013). "We neither reweigh the evidence nor determine the credibility of witnesses. We consider only the probative evidence and reasonable inferences supporting the judgment and reverse only on a showing of

---

[10] For practical purposes, it may appear that the two standards will often produce the same results or operate so similarly as to be interchangeable. Certainly this Court has not been immune to using one in lieu of the other—even in the context of Criminal Rule 4 review. Nevertheless, we have previously noted that the "clearly erroneous" standard is more appropriate—semantically and jurisprudentially—when reviewing a trial court's factual findings. See Pruitt v. State, 834 N.E.2d 90, 104 (Ind. 2005), reh'g denied, cert. denied; Candler v. State, 837 N.E.2d 1100, 1103–04 (Ind. Ct. App. 2005).

clear error. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." Id. (internal citations and quotations omitted).

### B. Prioritizing Cases Under Criminal Rule 4(B)

The constitutional protections embodied by Criminal Rule 4 necessitate a prioritized treatment when a defendant files a motion pursuant to Rule 4(B)—a treatment beyond simply assigning that defendant's case to the next presently vacant trial setting on the calendar.

> Rather, it must be assigned a meaningful trial date within the time prescribed by the rule, if necessary superseding trial dates previously designated for civil cases and even criminal cases in which Criminal Rule 4 deadlines are not imminent. We recognize, however, that emergencies in either criminal or civil matters may occasionally interfere with this scheme. Similarly, there may be major, complex trials that have long been scheduled or that pose significant extenuating circumstances to litigants and witnesses, which will, on rare occasions, justify application of the court congestion or exigent circumstances exceptions.

Clark, 659 N.E.2d at 551–52. Thus, courts recognize that Rule 4(B) does not necessarily present a bright-line approach whereby all other cases must yield to the defendant who files a speedy trial motion. McKay v. State, 714 N.E.2d 1182, 1188 (Ind. Ct. App. 1999).

For example, in the criminal arena speedy trial motions are subject to their own internal prioritization. Where a longer-incarcerated defendant moves for a speedy trial, his or her request should generally take priority over a more recently charged movant. But this would not necessarily be the case if, say, the more recently charged defendant's Criminal Rule 4 deadline was significantly more imminent and there remained time after that deadline to hold the trial of the longer-incarcerated defendant before his or her deadline. See James v. State, 716 N.E.2d 935, 939 (Ind. 1999). Where the trial court's calendar can satisfy both Rule 4 deadlines, the longer-incarcerated defendant need not necessarily go first. After all, Rule 4 effectuates a "speedy" trial—not necessarily the "next" trial. But at the same time, and absent extenuating

16

circumstances, a defendant seeking a speedy trial would almost invariably be entitled to a trial setting ahead of any criminal defendant who had not filed a Rule 4 motion.

Similarly, "[a]lthough the right of the accused to a speedy trial stands higher than similar rights of civil litigants, civil settings need not always give way to criminal settings required by the time limitations in Crim. R.4." Baker v. State, 590 N.E.2d 1126, 1128 (Ind. Ct. App. 1992) (citing Gill v. State, 267 Ind. 160, 165, 368 N.E.2d 1159, 1162 (1977)). In addition to prioritizing the long-scheduled, complex civil matters or those with extenuating circumstances we referenced in Clark, civil settings must give way to speedy trial motions only "where the continuance of the civil trial will result in sufficient time to fully prepare for and accommodate the criminal trial." Gill, 267 Ind. at 165, 368 N.E.2d at 1162.

Nevertheless, "in order for the meaning of the rule not to be eviscerated, it is essential that courts honor requests made for speedy trials by scheduling trial dates within the time prescribed by the rule." McKay, 714 N.E.2d at 1188. And we therefore have referred to this as a requirement that speedy trial motions receive "particularized priority treatment." Clark, 659 N.E.2d at 551. But we do not intend to suggest that a trial judge must necessarily wipe his or her calendar clean, or jam a trial into an opening in a schedule or courtroom that lacks the space, time, and resources to accommodate it. They must, however, be mindful of their calendar and the seventy-day window and exercise all reasonable diligence to preserve the defendant's right to a speedy trial.

But at the same time, the aim of providing a speedy trial should never risk an unfair or incomplete trial. Rather, the trial judge should set the defendant's trial for the first setting not already occupied by a superseding speedy trial request or exceptional civil matter, or, if need be, create a new trial setting if time allows for the availability of a courtroom, witnesses, jury pool, and other necessary resources.

## C. Austin's Motions

There can be a number of reasons why a criminal defendant might request a speedy trial under Criminal Rule 4, ranging from solely vindicating his or her constitutional rights to a tactical move designed to force the State's hand and prompt a trial (or plea) before the evidence is fully developed. Both are equally legitimate, and justify the effort trial judges must take in reviewing—and rearranging—their calendars in light of a speedy trial motion. And we expect that criminal defendants in such cases would actively work with the trial court to ensure their trial moved along in an orderly and judicious fashion.

But what the rule does not contemplate, as we have said, is pursuit of a technical means to escape prosecution by, post-hoc, pot-shotting the trial court's calendar. This is why we reject a bright-line approach to its application. A criminal defendant may not, for example, after moving for a speedy trial and at the conclusion of his or her seventy days, simply present the trial court's past calendar and point to every gap, every day off, every non-trial use of the courtroom, and say "Gotcha! I must be discharged!" Not successfully, at least.

Here, Austin filed his motion for a speedy trial on June 6. Ten days later, his trial was set for August 8—roughly a week inside his seventy-day window. On July 27, the State moved to continue his trial due to congestion, arguing first that criminal defendant Eldon Harmon, who had a cause pre-dating Austin's, had also moved for a speedy trial—and Harmon had been in custody for nearly two years at that point. It also argued that there were fourteen additional criminal cases pending, involving twelve separate defendants, all of which pre-dated Austin's case—but it did not allege that any of those twelve defendants had filed motions for a speedy trial. Without a hearing, the trial court granted the State's motion for a continuance a few days later, setting a pre-trial conference for August 11.

Austin then requested that this pre-trial conference be moved forward a week, to August 4, and objected to any continuance of his trial. Austin said that he had a number of witnesses and family members who had booked plane flights from California and reserved hotel rooms and

rental cars in Indiana, and would—if anything, apparently—need a trial date earlier than August 8 in order to transfer those tickets and reservations.

At the August 4 pre-trial conference, the trial court noted Harmon's speedy trial motion as the basis for a finding of congestion and rescheduled Austin's trial for September 26. Austin objected for the record, and on August 17—after his seventy-day window closed—filed a motion for discharge pursuant to Criminal Rule 4.

Austin did not claim that the prior defendant's trial should not have taken precedence over his, but instead argued that no trials were scheduled for the week of August 15—the Monday of which was the last day of his speedy trial window—and that his case could therefore have proceeded that day. In support of this he attached the trial court's August schedule and an affidavit from his counsel's secretary, attesting that she had been in the courtroom on the morning of August 15 and observed that no trials or judicial proceedings of any kind were taking place.

The trial court held a hearing on Austin's motion on September 1. Austin again argued that his trial could have occurred on August 15. In response, the trial judge clarified that a custody and child support hearing that had been scheduled for that Monday morning had been moved to Monday afternoon and did, in fact, occur.

The State also pointed out that no jury had been called for the week of August 15, that the trial court was not prepared to hear a jury trial that week, and that the State could not have subpoenaed witnesses for that week on such short notice. The trial court maintained Austin's September 26 trial date (and in doing so implicitly denied Austin's motion for discharge).

So in accordance with the standard of review we discussed above, the trial court's initial finding of congestion requiring Austin's trial to be continued from August 8 is presumed valid. It then became Austin's responsibility to come forward with proof that the finding was factually or legally inaccurate. This we think he did by way of his motion for discharge and attached

exhibits highlighting the trial calendar and apparent scheduling vacancy on August 15. Absent the further findings from the trial court to explain the congestion, this would have been prima facie adequate for discharge. But once the trial court made further findings, the burden shifted back to Austin to show that those findings were clearly erroneous. See James, 716 N.E.2d at 939.

On appeal, Austin argues that the trial court justified congestion based on the August 15 custody hearing. But he says that hearing was not an emergency hearing nor was it a particularly complex matter. Therefore, he claims he could have—and should have—been tried on August 15 and it was clear error for the trial court to decide otherwise.

But a variety of things could constitute congestion. Loyd, 272 Ind. at 409, 398 N.E.2d at 1265. And although the trial court here did not issue a written order further explaining its finding of congestion, the transcript of the pre-trial conference indicates that several circumstances supported its determination.

The starting point was of course the court's initial decision to try the prior criminal case on August 8 instead of Austin's case. And though not necessarily always required, we find nothing wrong with the decision to prioritize the speedy trial request of a defendant who had been in custody for nearly two years over the request of one who had been in custody for a few months. But not setting a trial date for the following week was also based on the unavailability of the courtroom on August 15, as well as the unavailability of a jury that week and the unlikely availability of witnesses on short notice.

In light of the deference we show to a trial court's decision in these cases, we think this combination of concerns is sufficient to support a finding of congestion. While a trial court cannot blindly adhere to a calendar management process that, for example, by default only schedules criminal trials (and juries) on a biweekly basis, and then use that process as an excuse to refuse to acknowledge a speedy trial motion even when the trial court has enough time to call a jury, that is not what happened here. Here, the State filed its motion for a continuance on July

20

27 and the trial court initially approved it on July 29 (a Friday). Even if the trial court had immediately drawn names for prospective jurors and mailed those jurors a notice and summons, it is unlikely that such notice would have reached its recipients in time to comply with our jury rules—to say nothing of the other logistical requirements involved in holding a multi-day criminal trial on short notice.

The availability of witnesses presented a similar concern. The State argued that its witnesses could not have been subpoenaed in time for an August 15 trial, and Austin himself expressed a like view with respect to his own witnesses. This case involved a number of out-of-state individuals traveling to testify, and it was reasonable to find that sliding their travel plans back a week—with only a week's notice—was an unnecessarily burdensome requirement on those individuals where the trial could instead be reasonably reset to a later date. Simply put, as the State said, "[s]ome of the logistics surrounding this trial lend it to a more complex environment, [and] it doesn't lend to a quick continuance and a quick resetting." (Tr. at 237.)

And this makes it largely irrelevant whether the courtroom was already in use for another matter and whether that matter was deemed an "emergency." Continuance of the contested custody and child support hearing would still "not necessarily have accommodated the trial of [Austin's] case" because it still "would not guarantee a courtroom and a jury." Gill, 267 Ind. at 165, 368 N.E.2d at 1162. Finding otherwise would have accomplished nothing but providing the inefficient administration of justice in both the civil *and* the criminal cases.

In sum, we do not find the trial court's decision to continue Austin's trial beyond his seventy-day speedy trial window to be clearly erroneous.[11]

---

[11] Austin does not appeal a second continuance of his trial from September 26 to October 24. Nor does he challenge whether the initial resetting of his trial date to five weeks after his seventy-day window closed constituted "a reasonable time" under Criminal Rule 4.

21

However, we caution that "court congestion" is not a blank check for poor judicial administration. A defendant with adequate proof may successfully challenge a declaration of "court congestion" on appeal. The protections afforded a defendant under Criminal Rule 4 are not to be trampled upon and trial courts must remain vigilant in its enforcement.

## Conclusion

We affirm the admission of cocaine evidence at Austin's trial and the denial of his motion for discharge, and summarily affirm the Court of Appeals in all other respects.

Dickson, C.J., Rucker, Massa, and Rush, J.J., concur.