## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 20 2017, 7:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brandon E. Murphy
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthoni C. Thornburgh, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 20, 2017 <br><br> Court of Appeals Case No. <br> 05A02-1605-CR-1091 <br><br> Appeal from the <br> Blackford Superior Court <br><br> The Honorable <br> J. Nicholas Barry, Judge <br><br> Trial Court Cause No. <br> 05D01-1511-CM-271 |

**Kirsch, Judge.**

Anthoni C. Thornburgh ("Thornburgh") appeals his conviction, following a bench trial, for possession of marijuana[1] as a Class B misdemeanor. During a valid traffic stop of the vehicle in which Thornburgh was a passenger, sheriff's deputies conducted a dog sniff around the vehicle. After the drug-detection dog ("K-9") alerted to the presence of an illegal substance, deputies searched the vehicle and found marijuana. Thornburgh unsuccessfully moved to suppress that evidence, arguing that the dog sniff prolonged the traffic stop in violation of his Fourth Amendment rights. The evidence was subsequently admitted at trial over Thornburgh's continuing objection. The sole restated issue for our review is whether the trial court abused its discretion in admitting the evidence obtained as a result of the search. Finding no abuse of discretion, we affirm.

## Facts and Procedural History

On July 3, 2016, around 10:15 p.m., Deputy Michael Goldsmith ("Deputy Goldsmith") and Lieutenant James Heflin ("Lieutenant Heflin"), both with the Blackford County Sheriff's Office, were on patrol when they received information from a Delaware County Drug Task Force Agent. The Agent reported that two vehicles—a white Buick and a maroon Malibu—were traveling in tandem from Muncie to Hartford City and were believed to be carrying illegal drugs. Numerous deputies were alerted to this information. Identifying two such vehicles traveling north on State Highway 3, Deputy

---

[1] *See* Ind. Code § 35-48-4-11(a).

Goldsmith and Lieutenant Heflin began following the Buick, while other deputies followed the Malibu. Soon thereafter, Deputy Goldsmith and Lieutenant Heflin observed the Buick illegally cross the highway's center line and initiated a traffic stop just north of the intersection of County Road 200 South and State Road 3. Deputy Goldsmith approached the Buick on the driver side, while Lieutenant Heflin approached on the passenger side. There, the deputies noted a female driver ("the driver") and male passenger ("the passenger") in the front seat and two children in car seats and a male passenger, later identified as Thornburgh, in the back seat.

[3] Deputy Goldsmith explained the reason for the stop and asked the driver for her license, registration, and proof of insurance. Following standard department procedure, Deputy Goldsmith also asked the passenger and Thornburgh for their names and identifying credentials. He then informed the adults in the Buick ("occupants") that he intended to have his K-9 conduct a "clean air sniff around the vehicle" and explained to the occupants "the simple K-9 instructions." *Tr.* at 10. Deputy Goldsmith instructed the driver to shut off the vehicle and roll up the windows. While walking back to their patrol car, Deputy Goldsmith asked Lieutenant Heflin to do a records search, i.e., run the occupants' names through dispatch to check if the driver had a valid license and if the occupants had outstanding warrants. *Id.* Meanwhile, other deputies continued to follow the Malibu and remained in radio contact with dispatch.

[4] Lieutenant Heflin testified at trial that, when Deputy Goldsmith gave him the identification information, he "took over the traffic stop at that point";

however, radio traffic prevented him from immediately running the records search. *Id*. at 64-65. Meanwhile, Deputy Goldsmith retrieved his K-9 and walked the dog around the vehicle; the dog alerted to the presence of an illegal drug in the Buick. Lieutenant Heflin was able to complete the document investigation only after the K-9 alerted to the illegal substance. *Id*. at 65. Approximately three and a half minutes passed from the beginning of the traffic stop until the K-9 alerted.

[5] Based on the K-9's alert, the occupants were asked to exit the vehicle. A search of Thornburgh's person revealed "a set of digital weighing scales" and $25 in one dollar bills. *Tr*. at 13. A subsequent search of the Buick revealed a zip-lock-style bag containing marijuana, which deputies found hidden under a child car seat next to where Thornburgh had been seated. The large bag weighed 121.9 grams and held four individual bags containing smaller quantities of marijuana. Thornburgh was arrested, was read his *Miranda* rights, and confessed to the knowledge of the existence of the marijuana and to his ownership of it. The State charged Thornburgh with possession of marijuana as a Class B misdemeanor.

[6] Prior to trial, Thornburgh filed a motion to suppress the marijuana found in the course of the traffic stop, arguing that it was found only as the result of an unlawfully extended stop. The trial court denied Thornburgh's motion after a hearing. Thornburgh again objected to the admission of the marijuana at trial, and the trial court, relying on the same rationale from the suppression hearing, overruled Thornburgh's objection and allowed the marijuana to be admitted.

*Id.* at 45-46. Thornburgh was convicted of possession of marijuana and was sentenced to one hundred and eighty days in jail, all suspended except for time served. Thornburgh was placed on supervised probation for 365 days. Thornburgh now appeals.

## Discussion and Decision

[7] We begin by noting that, although Thornburgh correctly frames his issue on appeal as "[w]hether the trial court abused its discretion by admitting evidence obtained in the course of a traffic stop," *Appellant's Br.* at 4, his citation to *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) and *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008)—two interlocutory appeals challenging a trial court's denial of a motion to suppress—suggest he is appealing the denial of his motion to suppress. *Appellant's Br.* at 7. Where, as here, a defendant does not seek interlocutory review of the denial of a motion to suppress certain evidence, and the case proceeds to trial, our review is whether the trial court abused its discretion when it admitted that same evidence at trial.[2] *See Weathers v. State*, 61 N.E.3d 279, 284 (Ind. Ct. App. 2016) (citing *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014)) (where defendant did not seek interlocutory review of denial

---

[2] We note this distinction because it is important as a procedural matter. "The difference between the standard of review we apply to the trial court's ruling on a motion to suppress evidence and the standard of review we apply to the trial court's ruling on the admissibility of evidence at trial lies in the facts the trial court can consider when making its decision." *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014). "If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence." *Id.* Here, because the foundational evidence at the suppression hearing was the same as that presented at trial, we base our decision on evidence presented at both the suppression hearing and the trial.

of motion to suppress certain evidence, defendant's appeal constituted request to review trial court's decision to admit same evidence at trial).

[8] A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Hansbrough v. State*, 49 N.E.3d 1112, 1114 (Ind. Ct. App. 2016), *trans. denied.* "We review its rulings 'for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013)). "[W]hen reviewing a trial court's ruling on the admissibility of evidence obtained from an allegedly illegal search, we do not reweigh the evidence but defer to the trial court's factual determinations unless clearly erroneous." *Weathers*, 61 N.E.3d at 284 (citing *Hansbrough*, 49 N.E.3d at 1114). Further, we view conflicting evidence in the light most favorable to the ruling, and we consider any legal question of the constitutionality of a search and seizure de novo. *Id.*

[9] Thornburgh contends that the marijuana recovered from the Buick should not have been admitted into evidence because it was obtained during a search that violated his rights under the Fourth Amendment to the United States Constitution.[3] The Fourth Amendment protects persons from unreasonable

---

[3] "Although nearly identical in wording, the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution are independently interpreted and applied." *Russell v. State*, 993 N.E.2d 1176, 1179 (Ind. Ct. App. 2013). "An appellant's failure to provide us with a separate analysis

search and seizure and this protection has been extended to the states through the Fourteenth Amendment. *Hansbrough*, 49 N.E.3d at 1114. Because a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle, such police action does not implicate a driver's rights under the Fourth Amendment. *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2015). Further, the Indiana Supreme Court has recognized that a reasonable dog sniff is not a search for purposes of the Fourth Amendment. *Id*. "However, such a sweep is an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity." *Id*.

[10] Here, the driver of the Buick was pulled over after she illegally crossed the center line of a highway; Thornburgh does not dispute the validity of that initial traffic stop. Instead, citing to *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), he asserts that the stop became unlawful under the Fourth Amendment because Deputy Goldsmith's K-9 instructions to the occupants and the subsequent dog sniff prolonged the stop beyond the time reasonably required to complete the original purpose of the stop, and the deputies lacked reasonable suspicion that Thornburgh was engaged in criminal activity to otherwise extend the stop. *Appellant's Br*. at 6-9. Therefore, he argues that the subsequent search of the

---

for each constitutional claim constitutes waiver." *Id*. The State contends that Thornburgh has waived any claim under the Indiana Constitution by failing to provide an independent analysis. We agree.

Buick was illegal and the evidence obtained during that search was inadmissible under the reasoning in *Rodriguez*. We disagree.

[11] In *Rodriguez*, a K-9 officer observed a Mercury Mountaineer illegally cross onto the shoulder of a Nebraska state highway, and he pulled the vehicle over at 12:06 a.m. *Rodriguez*, 135 S. Ct. at 1612. The K-9 officer's dog remained in the patrol car while the K-9 officer approached the Mountaineer and gathered the license, registration, and insurance information from the driver, later identified as Rodriguez. *Id*. at 1613. After completing a records check, the K-9 officer returned to the Mountaineer, asked the passenger for his license, and began questioning the passenger about where the two men were coming from and where they were going. *Id*. The K-9 officer again returned to his patrol car, completed his records check on the passenger, and called for a second officer. *Id*. The K-9 officer wrote a warning ticket for the moving violation and returned a third time to the Mountaineer to issue the warning to Rodriguez. *Id*. By 12:27 or 12:28 a.m., the K-9 officer "had finished explaining the warning to Rodriguez," and had returned all documents to Rodriguez and his passenger. *Id*. The K-9 officer later testified that, at that point, Rodriguez and his passenger "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] … took care of all the business." *Id*. (citation omitted).

[12] Although the justification for the traffic stop was "out of the way," the K-9 officer asked permission to walk his dog around the Mountaineer. *Id*. When Rodriguez refused, the K-9 officer instructed Rodriguez to turn off the ignition,

exit the car, and stand in front of the patrol car to wait for the other responding officer. *Id*. Rodriguez complied, and the other officer arrived at 12:33 a.m. The K-9 officer then retrieved his dog and led him twice around the Mountaineer. The dog alerted to the presence of drugs on the second pass. "All told, seven or eight minutes had elapsed from the time the [K-9 officer] issued the written warning until the dog indicated on the presence of drugs." *Id*. A search of the Mountaineer revealed a large bag of methamphetamine. *Id*.

[13] The federal district court denied Rodriguez's motion to suppress the evidence found during the search. Noting that in the Eighth Circuit "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions," the district court found that seven to ten minutes added to the stop by the dog sniff "was not of constitutional significance." *Id*. at 1613-14 (citation omitted). Based on that determination, Rodriguez entered a conditional guilty plea and was sentenced to five years in prison. *Id*. at 1614. On appeal, the Eighth Circuit affirmed, finding that the "seven- or eight-minute delay" resembled delays that the court had previously ranked as permissible. *Id*. at 1614. As such, the Eight Circuit found that the delay constituted an acceptable "de minimis intrusion on Rodriguez's personal liberty." *Id*. at 1614.

[14] The United States Supreme Court granted certiorari to "resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id*. The *Rodriguez* Court determined, that "the tolerable

duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns. *Id*. at 1614 (citation omitted). The Court held, "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id*. (citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. Noting that "the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention," the *Rodriguez* Court cautioned that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. *Id*. at 1614-15 (citations omitted). As such, the *Rodriguez* Court rejected the government's suggestion that an officer may incrementally prolong a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop. Instead, the Court found the "critical question" is not, "whether the dog sniff occurs before or after the officer issues a ticket," but "whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id*. at 1616. In *Rodriguez*, the Court found that the dog sniff did prolong the traffic stop.

[15]    Recently, this court applied the *Rodriguez* analysis to determine whether a dog sniff prolonged a traffic stop in *Hansbrough* and *Washington v. State*, 42 N.E.3d 521 (Ind. Ct. App. 2015) (rehearing opinion reaffirming conviction pursuant to *Rodriguez* and concluding that dog sniff did not prolong traffic stop), *opinion on reh'g, trans. denied, cert. denied*, 137 S. Ct. 35 (2016). In *Washington*, the

defendant was pulled over by an officer for a driving infraction. *Washington*, 42 N.E.3d at 523. The officer asked Washington a few questions and returned to his patrol car less than three minutes later. While in his vehicle, the officer's computer "was in a dead spot and after four or five minutes of not receiving a response, he contacted control." *Id*. About eight minutes after the stop, dispatch informed the officer that Washington had a valid driver's license. *Id*. Two minutes later and less than eleven minutes after Washington's vehicle had been stopped, a K-9 officer deployed his dog. At that time, the officer had not completed the electronic ticket. About one minute later, the K-9 indicated the presence of an illegal drug. *Id*. at 524. Finding no conflict with *Rodriguez*, our court on rehearing agreed that the stop was not prolonged by the dog sniff and, therefore, found no abuse of discretion in the trial court's act of admitting the evidence found as a result of the dog sniff. *Id*.

[16] In *Hansbrough*, an officer legally stopped Hansbrough for "following less than one second of braking distance behind another vehicle." *Hansbrough*, 49 N.E.3d at 1113. The officer asked Hansbrough for his license, registration, and insurance information and also asked Hansbrough where he had come from and where he was headed. *Id*. While speaking with Hansbrough, the officer "observed what he believed to be marijuana 'shake'" near the cup holder and, based on this observation, suspected the presence of drugs. *Id*. Accordingly, while walking back to his police vehicle with Hansbrough's documents, the officer called a K-9 unit to the scene. The officer then sat in his patrol car and began typing out a warning ticket and running Hansbrough's records check.

The officer returned once to Hansbrough's vehicle to verify his address. *Id.* About fourteen minutes after the commencement of the traffic stop, the K-9 unit arrived at the scene. *Id.* At that time, the officer was on the phone checking for any outstanding warrants and had not yet completed his paperwork for the traffic stop. *Id.* Sixteen minutes after the traffic stop began, the K-9 officer conducted a dog sniff around Hansbrough's vehicle, and the dog "alerted to the presence of narcotics." *Id.* The officer was still on the phone checking for warrants at the time the K-9 alerted. *Id.* Based on the alert, the officers searched Hansbrough's car and found a handgun underneath the driver's seat. *Id.* at 1114. Our court found that the traffic stop was not completed and, therefore, the stop was not prolonged by the dog sniff. *Id.* at 1115. Accordingly, we held that the trial court did not abuse its discretion by admitting the evidence found as the result of the dog sniff. *Id.*

[17] Thornburgh states, without more, that the instant case can be distinguished from *Washington* and *Hansbrough*. *Appellant's Br.* at 8. We disagree. In fact, we find the facts and holdings in *Rodriguez*, *Washington*, and *Hansbrough* bolster the trial court's determination in the present case that Thornburgh's traffic stop was not unconstitutionally prolonged by the dog sniff. Here, the facts and inferences from the record before us indicate that the dog sniff was conducted while the traffic stop was ongoing and, pursuant to *Rodriguez*, the dog sniff occurred prior to the completion of the "mission" of the traffic stop. *Rodriguez*, 135 S. Ct. 1615. Deputy Goldsmith stopped the vehicle and obtained the occupants' names and pertinent information, and Lieutenant Heflin assumed

the duty of running the records check. Deputy Goldsmith testified during the suppression hearing that a "car camera" in his cruiser was running during the traffic stop and that the camera created a video of the pertinent portions of the stop. *Tr.* at 11. The DVD of that video, which the State played during the suppression hearing, revealed that Deputy Goldsmith spoke with the driver for about two minutes and then spent about one and a half minutes retrieving his K-9 and running him around the Buick. *Id.* at 12-13. In all, only three and a half minutes passed between the time the Buick was pulled over and the time the K-9 alerted to the drugs in the Buick. Although Thornburgh argues that Deputy Goldsmith's act of conducting the dog sniff added time to the traffic stop, the trial court disagreed, reasonably believing Lieutenant Heflin's testimony that radio traffic on the dispatch radio prevented him from completing the occupants' records check until after the K-9 had alerted to an illegal substance in the Buick. *Tr.* at 22-23. On appeal, "we do not reweigh the evidence, we consider conflicting evidence in a light most favorable to the trial court's ruling, and we defer to the trial court's factual determinations unless clearly erroneous. *State v. Gray*, 997 N.E.2d 1147, 1150 (Ind. Ct. App. 2013), *trans. denied* (2015). Because the dog sniff did not illegally prolong the traffic stop, the search and seizure were constitutional under the Fourth Amendment. Accordingly, we find that the trial court did not abuse its discretion by admitting the marijuana into evidence.

Affirmed.

May, J., and Crone, J., concur.