FILED

Aug 30 2023, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Susan D. Rayl
Morgan Brading
Harshman | Ponist Smith & Rayl
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rashad Shareef Bryant,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 30, 2023

Court of Appeals Case No.
23A-CR-18

Interlocutory Appeal from the
Hendricks Superior Court

The Honorable Stephenie LeMay-Luken, Judge

Trial Court Cause No.
32D05-2201-F2-1

**Opinion by Judge Crone**
Judges Brown and Felix concur.

**Crone, Judge.**

## Case Summary

[1] Rashad Shareef Bryant was arrested after a traffic stop and charged with multiple drug- and firearm-related offenses. He filed a motion to suppress the

evidence seized during the stop as well as any testimony about that evidence, arguing that the stop was unreasonably prolonged so that a police dog could sniff his vehicle for contraband. After a hearing, the trial court denied Bryant's motion. On appeal, Bryant argues that the ruling is erroneous. We disagree and therefore affirm.

## Facts and Procedural History

At 2:22 a.m. on January 29, 2022, Brownsburg Police Department Officer Elsiana Crosby activated the emergency lights on her patrol car and stopped Bryant's SUV after he turned from Connector Road onto North Ronald Reagan Parkway. During a July 2022 deposition that was taken in anticipation of the October 2022 suppression hearing,[1] Officer Crosby testified that she stopped Bryant because he made "a fast turn, a little bit more erratic, something you would see out of an impaired driver typically. And right of the fog line, left of the centerline- - or, at least touching the [right of the fog line]." Ex. Vol. 3 at 5. Footage from Officer Crosby's bodycam video shows that she told Bryant that she pulled him over for not using his turn signal when he "came off Connector Road." State's Ex. 3 at 00:07. Bryant apologized, and the officer said that it was "no big deal[.]" *Id.* at 00:08.

Officer Crosby asked Bryant for his driver's license and vehicle registration, which he gave to her, and asked where he was going. Bryant replied that he was

---

[1] Officer Crosby was scheduled for a military deployment and was unavailable for the hearing.

"picking [his] friend up from this club." *Id*. at 00:12. The officer asked Bryant what kind of club it was and where it was. Bryant said that he "didn't even know the name" of the club and that he was going to look at his friend's directions to the club when he got to a gas station. *Id*. at 00:46. Officer Crosby asked Bryant why he was going to a gas station. Bryant stated that he "just need[ed] to go to the gas station" and that he did not do anything wrong, and he asked her to write him "a ticket or whatever you're gonna do." *Id*. at 01:07. Officer Crosby told Bryant that she was "not gonna write a ticket[.]" *Id*. at 01:09.[2] Bryant said, "Thank you. I'm not drinking, no nothing." *Id*. at 01:12. Officer Crosby stated that she was "doing OWI interdiction" and had asked him about the gas station because she noticed that he had gas in his vehicle. *Id*. at 01:13. Bryant said, "I'm going to set up the directions when I get over [there]." *Id*. at 01:21. Officer Crosby told Bryant to "hang tight" and walked toward her car with his license and registration. *Id*. at 01:22. En route, she remarked, "I don't know, might not be so good." *Id*. at 01:30.

[4] Officer Crosby reentered her car, turned on the dome light, and exclaimed, "I wish I could smell[,]" apparently referring to her inability to detect the odor of an alcoholic beverage. *Id*. at 01:39.[3] She entered information from Bryant's registration into her laptop computer and radioed Canine Officer Bradley Carr

---

[2] In her deposition, Officer Crosby stated that she tells motorists that she is not going to write a ticket as a "tactic" that "typically […] relaxes people." Ex. Vol. 3 at 7.

[3] Bryant incorrectly interprets this remark as "[Bryant] does not smell[.]" Reply Br. at 7.

to ask if he was "available to swing by [her] stop[.]" *Id*. at 02:48. Officer Carr responded affirmatively. Officer Crosby scrolled through information on her computer screen, which included a photo of a person who resembled Bryant. *Id*. at 04:16. She then muttered, "Condition," and scanned the barcode on the back of Bryant's license with a handheld scanner. *Id*. at 04:35-04:51. Officer Crosby interacted with her computer and pulled up several different screens, one of which showed a photo of a person who resembled Bryant *Id*. at 06:02.

[5] Officer Crosby then conducted Google searches on her phone. *Id*. at 06:11. Slightly over a minute later, she put down her phone and turned off the dome light. *Id*. at 07:28. Shortly after that, she turned the dome light back on and apparently muted her bodycam audio. *Id*. at 08:49. Officer Carr approached Officer Crosby's vehicle, and she rotated her laptop screen to face the front passenger window. *Id*. at 09:19. She unmuted her bodycam audio, apparently mid-conversation, and stated, "Been a while, but worth looking at, I think." *Id*. at 09:24. Officer Carr asked, "Are you gonna pull him out? Is it just him?" *Id*. at 09:26. Officer Crosby replied, "Yeah, I was gonna see if you would go up there and smell him." *Id*. at 09:29. Officer Carr said, "OK, I'll ask him if he has his insurance," and started walking around the front of Officer Crosby's car toward Bryant's vehicle. *Id*. at 09:31. Officer Crosby called out, "And hey, you can ask him why his license are [sic] conditional, and then you can pull him out and we'll put him in the front seat of my car." *Id*. at 09:40.

[6] At that point, Officer Carr's bodycam also began recording. He approached Bryant, who was still sitting in his vehicle, and asked, "Hey, why does your

license show conditional status?" State's Ex. 4 at 00:09. Bryant replied, "Uh, I don't know. I used to have a conditional license 'cause I had, uh, back in 2015 I had to apply to get my license back." *Id.* at 00:19. Officer Carr replied, "OK. Do you have anything illegal in the car right now?" *Id.* at 00:20. Bryant said, "No, sir." *Id.* at 00:21. Officer Carr asked, "Do you have a problem with giving consent to search the vehicle?" *Id.* at 00:24. Bryant replied, "No, no, I don't want my car searched. I didn't do anything wrong." *Id.* at 00:28. The officer asked, "Well, do me a favor, will you just hop out for me?" *Id.* at 00:29. Bryant replied, "No, sir, for what?" *Id.* at 00:30. Officer Carr said, "Because I'm gonna run my dog around your car, and you can't stay in it." *Id.* at 00:32. Bryant said, "No, no." *Id.* at 00:33. The officer said, "Yeah, yeah, you need to step out of the car." *Id.* at 00:34. Bryant again asked, "For what?" *Id.* at 00:35. Officer Carr replied, "Because the Supreme Court has said we have the right to ask you to step out of the car for officer safety. I'm gonna run my dog around the car, he bites, and I'm not gonna let him bite you." *Id.* at 00:43. Bryant insisted that he had not done anything wrong, that he did not want his vehicle searched, and that "it was a turn signal, that's all that's been going on." *Id.* at 00:47.

[7]     Bryant refused to get out of his vehicle, and a back-and-forth ensued between him and Officer Carr, who was soon joined by Officer Crosby. Officer Crosby asked Officer Carr if he had smelled any alcohol, and he replied, "I didn't smell anything." *Id.* at 03:02. Officer Crosby asked Bryant why his license was conditional and what those conditions were, and he replied that he could drive for work and was a Lyft driver. *Id.* at 04:43. Officer Crosby said, "I thought you

were picking your buddy up." *Id.* at 04:45. Bryant replied, "Yes, I am." *Id.* at 04:47. The officer said, "Oh, on Lyft, OK, so you have the app?" *Id.* at 04:48. Bryant said that he did. The officer asked if she could see the app, and Bryant replied, "I don't have to do all that." *Id.* at 04:57. Officer Crosby reminded Bryant that his license was "conditional," told him to "hang tight," *id.* at 05:01, and returned to her car to call her shift supervisor, Sergeant Matt Wing.

[8] Bryant remained in his vehicle with the window rolled up and made several phone calls. He rolled down his window for a brief interchange with Officer Carr, and then Sergeant Wing arrived and asked him to exit the vehicle to avoid any use of force or a resisting charge. Negotiations proved fruitless, and the sergeant asked Officer Carr to get his dog. *Id.* at 12:44. Ultimately, after giving several warnings and asking Bryant to unlock his door, Officer Crosby shattered Bryant's window. *Id.* at 20:52. Bryant was removed from the vehicle and handcuffed. Shortly thereafter, Officer Carr's dog alerted to the presence of a controlled substance at the front "passenger side door seam[.]" Tr. Vol. 2 at 17. Officer Heather Foote searched behind the vehicle's glove box and found a bag containing three baggies of cocaine, a scale, a Glock handgun with a loaded magazine, and a loaded Glock extended thirty-round magazine. Police patted down Bryant near Officer Crosby's car, and an additional baggie of cocaine was found in that area.

[9] The State charged Bryant with level 2 felony dealing in cocaine, level 3 felony possession of cocaine, level 4 felony unlawful possession of a firearm by a serious violent felon, class A misdemeanor carrying a handgun without a

license, class A misdemeanor resisting law enforcement, and class C misdemeanor violation of driving conditions. The State also alleged that Bryant was a habitual offender. Bryant filed a motion to suppress the evidence seized during the traffic stop and any testimony regarding that evidence, arguing that the traffic stop was unreasonably prolonged to allow the dog to sniff his vehicle. At the hearing on the motion, Sergeant Wing and Officers Carr and Foote testified. Officer Crosby's deposition was admitted into evidence, as were the police incident report and DVDs of the officers' bodycam footage. In November 2022, the trial court issued an order summarily denying Bryant's motion. This interlocutory appeal ensued.

## Discussion and Decision

[10] Bryant asserts that the trial court erred in denying his motion to suppress. "We review a trial court's denial of a defendant's motion to suppress deferentially, construing conflicting evidence in the light most favorable to the ruling, but we will also consider any substantial and uncontested evidence favorable to the defendant." *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014). When the trial court's ruling concerns the constitutionality of a search or seizure, it presents a question of law, which we address de novo. *Id*. We may affirm the denial of a motion to suppress on any legal theory supported by the record. *State v. Jones*, 191 N.E.3d 878, 889 (Ind. Ct. App. 2022), *trans. denied*.

[11] "The Fourth Amendment to the U.S. Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and

seizures conducted without a warrant supported by probable cause." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013).[4] "As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception." *Id.* "The State has the burden of demonstrating that the measures it used to seize evidence were constitutional." *Porter v. State*, 985 N.E.2d 348, 353 (Ind. Ct. App. 2013).

[12] Bryant does not challenge the validity of the traffic stop itself, which was based on one or more traffic violations witnessed by Officer Crosby. *See Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013) ("It is unequivocal under our jurisprudence that even a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle."). Moreover, it is well settled that a dog sniff is not a search protected by the Fourth Amendment to the United States Constitution. *Tinker v. State*, 129 N.E.3d 251, 256 (Ind. Ct. App. 2019), *trans. denied.* "Accordingly, no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself." *Id.* at 255-56 (quoting *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010)).

---

[4] Bryant summarizes a case that relied on the similarly worded Article 1, Section 11 of the Indiana Constitution, but he provides no fact-specific analysis based on *Litchfield v. State*, 824 N.E.3d 356 (Ind. 2005), in his initial brief. Accordingly, he has waived any state constitutional claim. *See White v. State*, 199 N.E.3d 1249, 1253 n.3 (Ind. Ct. App. 2022) (finding state constitutional claim waived due to appellant's failure to provide separate analysis under Article 1, Section 11), *trans. denied* (2023); *see also Watkins v. State*, 85 N.E.3d 597, 600 (Ind. 2017) (noting that "*Litchfield* governs the reasonableness of … traffic stops [and] vehicle searches"). Bryant impermissibly attempts to avoid waiver by including a *Litchfield* analysis in his reply brief, to which the State had no opportunity to respond.

"A narcotics dog sweep, however, becomes 'an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity.'" *Id*. at 256 (quoting *Austin*, 997 N.E.2d at 1034. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns[.]" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id*. (citation, quotation marks, and brackets omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*United States v. Sharpe*, 470 U.S. 675, 686 (1985).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." *Rodriguez*, 575 U.S. at 355 (citation, quotation marks, and brackets omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and

proof of insurance." *Id*. By contrast, a dog sniff "is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id*. (citation, quotation marks, and brackets omitted). "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id*. at 356. "The critical question … is not whether the dog sniff occurs before or after the officer issues a ticket, … but whether conducting the sniff prolongs—*i.e.*, adds time to—the stop[.]" *Id*. at 357 (citations and quotation marks omitted). "The burden is on the State to show that the time for the traffic stop was not increased due to a canine sniff." *Tinker*, 129 N.E.3d at 256.

[15] Bryant argues,

> The State did not offer any evidence or testimony as to whether Officer Crosby was diligently pursuing an investigation into the traffic stop or where she was in her investigation when Officer Carr arrived or thereafter. Officer Crosby's body-camera footage merely shows her sitting in her car and running Google and MyCase searches.

Appellant's Br. at 11-12.

[16] The foregoing factual summary establishes that Officer Crosby was investigating Bryant's driving privileges, which was well within her mission, at least until she started conducting Google searches on her phone, which may or

may not have been in furtherance of her investigation.[5] And it was also within her mission to question Bryant about the conditions on his license. Furthermore, Officer Crosby had not yet dispelled (and had been unable to dispel by olfactory means) her suspicion, based on Bryant's "erratic" turn onto Ronald Reagan Parkway, that he was impaired as a result of alcohol consumption.

[17] When Officer Carr arrived, Officer Crosby delegated issues related to Bryant's license conditions and possible intoxication to him, at least initially.[6] And because the purpose of the stop had not yet been accomplished, it was permissible for Officer Carr to order Bryant to exit his vehicle, and Bryant was obligated to comply with that order. *See Tumblin v. State*, 736 N.E.2d 317, 321 (Ind. Ct. App. 2000) ("Law enforcement officers may, *as a matter of course,* order the driver and passengers to exit a lawfully stopped vehicle.") (emphasis added) (citing, inter alia, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), and *Maryland v. Wilson*, 519 U.S. 408 (1997)), *trans. denied* (2002).[7] But Bryant repeatedly refused to comply, and it was his obstinancy, rather than the dog sniff itself,

---

[5] No testimony was elicited on this specific point at Officer Crosby's deposition, although the officer testified that she was "still working" when Officer Carr approached Bryant's vehicle. Ex. Vol. 3 at 8.

[6] Officer Crosby could have asked Bryant to perform field sobriety tests, such as a walk-and-turn test or a one-leg-stand test, but we note that one of Bryant's excuses for refusing to exit his vehicle was that he did not "even have socks on[,]" State's Ex. 4 at 08:47, and the vehicle's rear window was coated with frost.

[7] That Officer Carr asked Bryant to exit the vehicle so that he could conduct a dog sniff is inconsequential.

that significantly prolonged the duration of the traffic stop.[8] Consequently, we affirm the trial court's denial of his motion to suppress.

[18] Affirmed.

Brown, J., and Felix, J., concur.

---

[8] During the standoff, Officer Crosby asked Bryant about the conditions on his license, and his evasive response obviously failed to dispel her suspicions about whether he was legally operating his vehicle. Ultimately, Bryant was charged with violating those conditions.