

IN THE

# Court of Appeals of Indiana

Scotty Lee Van Hawk,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Feb 06 2026, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

February 6, 2026

Court of Appeals Case No.
24A-CR-3161

Appeal from the Kosciusko Circuit Court

The Honorable Michael W. Reed, Judge

Trial Court Cause No.
43C01-2303-F5-214

---

**Opinion by Judge Weissmann**
Judges Bradford and DeBoer concur.

**Weissmann, Judge.**

After repeatedly contacting and harassing his ex-wife in violation of multiple protective orders, Scotty Lee Van Hawk was charged with and convicted of three counts of Level 5 felony stalking. Van Hawk waived his right to trial counsel and represented himself at trial. Now he appeals, by counsel, claiming the trial court violated his speedy trial rights and denied him a fair trial by refusing to sever his charges, failing to accommodate his hearing impairment, deeming his waiver of counsel valid and denying him standby counsel, providing inadequate notice of the trial date, and restricting his presentation of evidence. Finding no error, we affirm.

## Facts

Van Hawk and N.V. were married for around 15 years and have a son and a daughter (the Children). "In the beginning," Van Hawk and N.V.'s marriage "was great." Tr. Vol. III, p. 105. But Van Hawk's behavior eventually "turned abusive and scary," and when N.V. filed for divorce in 2019, Van Hawk reacted angrily. *Id.*

The Children were around seven and nine years old when N.V. and Van Hawk divorced. N.V. tried to cooperate with Van Hawk over parenting time, but his aggressive behavior eventually led her to seek, and be granted, a protective order that prohibited Van Hawk from "harassing, annoying, telephoning, contacting, or directly or indirectly communicating with [N.V.] . . . [e]xcept

reasonable, civil communications" involving the Children. Exh. Vol. V, p. 18. This first order of protection was in effect for two years, from December 27, 2019, to December 27, 2021, though another similar protective order would follow.

## I. Events Leading to Stalking Charges

## A. Count I: March 5, 2020 – September 4, 2020

Soon after the first protective order was issued at the end of 2019, Van Hawk began texting N.V. with such frequency that the police had to "give him a talking to about how much he was texting." Tr. Vol. IV, p. 12. Though his communications generally related to parenting issues, the effect was often harassing toward N.V. and included statements like: "[Y]ou're a special kind of evil"; "[y]ou're a lying waste of oxygen"; and "[y]our evil reign is nearly over and you won't be able to hurt [the Children] anymore." Exh. Vol. V, pp. 34, 40, 54.

In addition to the harassing text messages, N.V. testified to several concerning incidents that occurred during the Count I timeframe. In March 2020, N.V. took the Children to the YMCA to swim. There, N.V. saw Van Hawk looking through a window into where the Children had been swimming. The couple's daughter, then around ten years old, approached Van Hawk and asked him to leave, which he did. However, the incident "scared" N.V., and she called the police as soon as she "felt safe enough" to do so. Tr. Vol. III, p. 108.

The following month, Van Hawk, who purported to be of "native" heritage, claimed the Children had "tribal rights" and threatened to take them "to a reservation where the tribal law would be protecting them against [N.V.]." *Id.* at 115, 120. He disappeared temporarily with the Children, causing N.V. to fear he had made good on his threat. N.V. reported the matter to the police, and the Children were eventually returned to her care.

In August 2020, N.V. decided to enroll the Children in public school after years of homeschooling. Van Hawk disagreed with that decision and likened N.V.'s choice to kidnapping the Children. Because the Children lacked the necessary physicals and vaccines, N.V. took them to the doctor. This prompted Van Hawk to accuse N.V. of allowing the doctor to molest his son when the doctor performed a testicular exam. Van Hawk then delayed returning the Children to N.V. the night before school was to start. He claimed that the Children's summer vacation did not end until after Labor Day and that school did not begin until mid-September. Though he was not the custodial parent, he messaged N.V. that he would be homeschooling the Children. When N.V. sought help from the police, Van Hawk texted, "[The Children are] on summer break with me after you held them hostage for months torturing them keeping them from me." Exh. Vol. V, p. 61.

Later that month, Van Hawk created a website aimed at N.V. and her parents. He accused N.V.'s parents of supporting child molesters based on his belief that they had not done enough to protect N.V. from a molestation by her cousin

when she was 8 years old. N.V. had confided in Van Hawk about the abuse when they were married, and he encouraged her to keep a diary. When she left the marriage, she left the diary behind, and Van Hawk published one of her diary entries on a flier and distributed it to about 70 of N.V.'s and her parents' neighbors.

[9]     Van Hawk's actions from March 2020 to September 2020, were the basis for Count I, Level 5 felony stalking in the instant case.

## B.    Count II: February 23, 2021 – March 17, 2021

[10]    In 2021, Van Hawk continued to text N.V. harassing messages. The messages generally focused on the Children but contained strong language aimed at N.V., such as: "[Y]ou're just the epitome of evil"; "[y]ou're a lying piece of sh*t"; and "[k]eep proving your (sic) insane and the kids aren't safe with you[,] all you child molester cousin f**king daddy sucking sickos." *Id.* at 90, 91, 125.

[11]    Between February and March 2021, Van Hawk and N.V. conducted their parenting time exchanges of the Children at a police station. However, after an exchange in late February, Van Hawk began following N.V. home, driving erratically and slamming on his brakes, trying to swerve into N.V.'s car. Based on this behavior, a police officer instructed Van Hawk to drive away from the police station first after the next exchange in March. But Van Hawk merely circled the building and waited to follow N.V. home. Van Hawk also used the Children's cell phones to track them and N.V.

[12] Also in March 2021, N.V. was sued by the "Child Protection Corp," an entity Van Hawk had formed using an alias. The lawsuit accused N.V. of "physically, emotionally, and psychologically abus[ing] children put in [her] care" and demanded a $1,500 judgment. *Id.* at 107. The same day the lawsuit was filed, N.V. received an email from a Child Protection Corp email address, accusing her of abducting unnamed children and demanding she return them to "their Tsalagi father[.]"[1] *Id.* at 121. A day later, in the same court as the Child Protection Corp lawsuit, Van Hawk petitioned to have N.V. involuntarily committed. His petition alleged that N.V. had delusions related to her molestation incident, used the police to scare the Children, and "repeatedly caused emotional and psychological trauma to minor children." *Id.* at 122.

[13] Van Hawk was then charged in March 2021 with stalking, invasion of privacy, and intimidation under a separate cause.[2] As a result of those charges, the trial court issued a second protective order, prohibiting Van Hawk from having any contact with N.V. "in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly, except through an attorney of record[.]" *Id.* at 21. While these separate charges were pending, Van Hawk went to jail, where he remained until February 2023. Van Hawk's conduct from

---

[1] According to N.V., "Tsalagi" is a word from the Cherokee language. Tr. Vol. III, p. 166.

[2] In March 2021, under Cause Number 43C01-2103-F5-281, Van Hawk was charged with one count of Level 5 felony stalking, three counts of Class A misdemeanor invasion of privacy, and two counts of Class A misdemeanor intimidation.

February 2021 until March 2021 eventually formed the basis for the Level 5 felony stalking charge as alleged in Count II of this case.

### C. Count III: February 9, 2023 – March 20, 2023

[14] When Van Hawk was released from jail on February 9, 2023, he immediately began contacting N.V. by email, text messages, and phone calls. Van Hawk also drove by the home N.V. shared with her parents and pulled into the driveway.

[15] According to N.V., Van Hawk's behavior and the threats he made against her and the Children "frightened" and "terrorized" her and ultimately caused her and the Children to experience post-traumatic stress disorder. Tr. Vol. III, p. 183. N.V. reported constantly looking over her shoulder and worrying that Van Hawk would show up at her location to "harm [her] or the children." *Id.* She still suffers from "night terrors" and needs medication to sleep at night. *Id.* In her words, "[it's] just a constant battle. . . . Nothing has stopped him. And I fear for my life every day" that Van Hawk is out of jail. *Id.* Van Hawk's behavior between February and March 2023 served as the basis for Count III, Level 5 felony stalking.

## II. Procedural History

[16] On March 22, 2023, the State charged Van Hawk in this case—Cause Number 43C01-2303-F5-214 ("F5-214")—with one count of Level 5 felony stalking and two counts of Class A misdemeanor invasion of privacy. His initial hearing was

held the following day. Van Hawk requested a "fast and speedy jury trial," and the trial court set the trial for April 25, 2023. Tr. Vol. II, p. 6. Van Hawk posted bond later that day, was released from jail, and placed on pretrial home detention and GPS electronic monitoring.

## A. Counsel Issues

[17] Van Hawk's appointed counsel entered his appearance on April 3, 2023. That same day, counsel filed, and the trial court granted, a motion to vacate the April 25 trial date. Counsel noted in his motion that Van Hawk had been released from jail, and counsel needed additional time to prepare for trial. Counsel also asked the trial court to schedule a pretrial conference for June 12. As for the delay the motion caused, the court noted on a pretrial conference memo— signed by both Van Hawk and his counsel—that Van Hawk "accepts the delay for [Criminal Rule 4] purposes." App. Vol. II, p. 75.

[18] On June 13, 2023, counsel filed a motion to withdraw from the case due to a breakdown in the attorney-client relationship, which the trial court granted on June 15. This proved to be just the beginning of Van Hawk's fraught relationships with his court-appointed attorneys. Between June 2023 and August 2024, Van Hawk was represented by three different attorneys, and he found fault with the representation provided by all of them. After repeated disagreements with Van Hawk and breakdowns in the attorney-client relationships, each of the attorneys filed—and the trial court granted—motions to withdraw their appearances.

## B.  Joinder and Severance

[19]  Van Hawk's behavior in the years following his divorce ultimately resulted in the State filing around 23 criminal charges against him under seven different causes. The charges all stemmed from Van Hawk's actions toward N.V. and violations of the protective orders. In August 2023, the State successfully moved to join all seven pending causes under the single cause that formed the basis of this appeal—F5-214. In March 2024, the State moved to amend the charges, replacing the 23 counts with just three counts of Level 5 felony stalking. And around six months later, Van Hawk's counsel filed a motion to sever the joined causes, requesting "separate trials for all alleged offenses." *Id.* at 177. The trial court denied the motion to sever.

## C.  Speedy Trial Requests

[20]  Meanwhile, between July 2023 and March 2024, while represented by counsel, Van Hawk filed three pro se motions for discharge, arguing that his speedy trial rights had been violated. Because counsel represented him at that time, the trial court took no action on the motions. In October 2023, Van Hawk, by counsel, filed a motion for discharge based on Criminal Rule 4 grounds, which the trial court denied.[3]

---

[3] The trial court granted Van Hawk's request to certify for interlocutory appeal the denial of his motion for discharge. On January 19, 2024, a motions panel of this Court declined to accept jurisdiction over the interlocutory appeal.

Counsel also filed a motion to dismiss the three felony stalking charges, alleging a violation of Criminal Rule 4 and Van Hawk's constitutional right to a speedy trial. Following a hearing, the trial court denied the motion.

## D. Self-Representation

Between April and September 2024, Van Hawk began to make it known that he wanted to proceed pro se. In April, while still represented by counsel, Van Hawk filed a motion with the trial court asserting his right to self-representation. He doctored the motion to make it appear that counsel had submitted it, but counsel informed the court that the motion had been filed without counsel's consent. Following a hearing held in May, the trial court issued an order finding, among other things, that Van Hawk had withdrawn his "Motion to Waive representation and to proceed pro se." App. Vol. III, p. 204. In an amended order, the trial court noted that Van Hawk had been provided "in writing the advice for self-represented defendants" and that said document was attached to the amended order. *Id.* at 205.

At a status conference held in September 2024, the trial court told Van Hawk that his "last attorney" had withdrawn his appearance. Tr. Vol. II, p. 159. Because Van Hawk had "no attorney in this case," the court asked him how he wanted to proceed. *Id.* Van Hawk told the court, "Let's proceed with the jury selection. Let's get this done." *Id.* at 160. Extensive colloquy followed, during which the court asked Van Hawk to reread the waiver of counsel document he had previously been provided then sign and date it. Van Hawk signed the

waiver document, and the court allowed him to waive counsel and proceed pro se. Van Hawk's jury trial was set to begin on September 10, 2024.

## E. Hearing Impairment

[24] The trial court learned that Van Hawk had a hearing impairment early in the proceedings of this case. Therefore, based on a recommendation from the Indiana Supreme Court's Office of Judicial Administration, the court arranged for amplification devices and real-time closed captioning to be used in the courtroom.

[25] The parties appeared for the jury trial on September 10, 2024. However, as jury selection commenced, Van Hawk, now proceeding pro se, told the court he was unable to participate because he could not "hear what's happening." *Id.* at 223. He requested a continuance so he could obtain a live transcriptionist, as he was unhappy with the amplification devices and real-time captioning that the court had provided. The court granted Van Hawk's request and directed him to promptly provide the court with the name of the service he wished to use and verify that the company would appear for trial. Van Hawk failed to do so.

[26] At a status conference held a week later, the trial court attempted to reset the jury trial for December 2024, but Van Hawk balked at the date. The court then set the trial for November 19 and 20, 2024. The court again directed Van Hawk to have his chosen live transcription service contact the court so arrangements could be made for the trial.

When an earlier trial date became available, the court issued an order on September 17, 2024, rescheduling the jury trial for October 8, 2024, noting Van Hawk's previous dissatisfaction with the proposed December date. The court further ordered that, if Van Hawk wished to use the live transcription service, he needed to arrange for the service to be available at the jury trial on October 8. To ensure Van Hawk received notice of the new trial date, the trial court had the order sent by email to Van Hawk on September 18 and also had the sheriff serve him with a copy of the order. That service by sheriff occurred on September 27. Van Hawk did not file an objection to the new trial date.

## F.    Jury Trial

At his October 8 trial, Van Hawk complained about the date change and receiving notice only on September 27. He also told the court he had contacted the transcription service about appearing for trial on November 19, the previous date on which the trial had been scheduled to begin. When the court asked Van Hawk if he was "making a motion to continue the trial," Van Hawk replied, "No, your honor," and the trial commenced. Tr. Vol. III, p. 7.

During the three-day jury trial, Van Hawk questioned and cross-examined witnesses, took the stand and testified on his own behalf, lodged objections, and presented an opening statement and closing argument. The jury found him guilty on all three counts of Level 5 felony stalking, and the trial court entered judgments of conviction accordingly. The court later sentenced Van Hawk to 3 years on each count—to be served consecutively—for an aggregate term of

9 years, with 4½ years served at the Indiana Department of Correction and the balance served on formal probation. The court also ordered Van Hawk to comply with a no-contact order protecting N.V. This appeal followed.

## Discussion and Decision

Van Hawk appeals his convictions, arguing that the trial court violated his right to a fast and speedy trial under Indiana Criminal Rule 4 and both the United States and Indiana Constitutions. He also claims he was denied a fair trial because the trial court refused to sever the joined criminal charges; failed to provide an effective accommodation at trial for his hearing impairment; deemed his waiver of counsel valid and compelled him to proceed without counsel or standby counsel; failed to give adequate notice of the rescheduled October 8, 2024 trial date; and cut short his cross-examination, case-in-chief, and closing argument. We address each argument and affirm.

## I.  Right to a Speedy Trial

"The right to a speedy trial is one of this country's most basic, fundamental guarantees . . . ." *Watson v. State*, 155 N.E.3d 608, 614 (Ind. 2020) (citing *Klopfer v. North Carolina*, 386 U.S. 213, 223-24, (1967)). "It protects against 'prolonged detention without trial' as well as unreasonable 'delay in trial.'" *Id.* (quoting *Klopfer*, 386 U.S. at 224). "To safeguard these protections, the State and the courts—together, the government—have an obligation to ensure the timely prosecution of criminal defendants." *Id.* "At times, however, that obligation

may remain unfulfilled." *Id.* "When that happens, a defendant can draw on three sources to assert a violation of this fundamental right." *Id.* They are the Sixth Amendment to the United States Constitution, Article 1, Section 12 of the Indiana Constitution, and Indiana Criminal Rule 4. *Id.* at 614-15. Van Hawk contends that his right to a speedy trial was violated under all three of these sources.

## A.   Discharge Under Indiana Criminal Rule 4

[31]   Where, as here, a Criminal Rule 4 case presents "'a question of law applied to undisputed facts, the standard of review—like for all questions of law—is de novo.'" *State v. Larkin*, 100 N.E.3d 700, 703 (Ind. 2018) (quoting *Austin v. State*, 997 N.E.2d 1027, 1039 (Ind. 2013)). "When the trial court makes factual findings (of congestion or emergency to justify a deadline extension), appellate courts show 'reasonable deference' to those findings and reverse only for 'clear error.'" *Bradley v. State*, 248 N.E.3d 563, 567 (Ind. 2024) (quoting *Austin*, 997 N.E.2d at 1040).

## 1.   Criminal Rule 4(B)

[32]   Van Hawk first argues that, as a defendant on home detention with GPS monitoring, he was entitled to a trial within 70 days of his speedy trial request under Criminal Rule 4(B). That rule provides, in relevant part, that an incarcerated defendant "held in jail" may "move for an early trial" and the defendant will be discharged "if not brought to trial within seventy (70)

calendar days from the date of such motion." Ind. Crim. Rule 4(B)(1) (2023).[4] The only exceptions to this rule are when the defendant seeks a continuance within the 70-day period, the delay is otherwise caused by the defendant's act, or court congestion prevents the defendant's trial from occurring within the 70-day period. Crim. R. 4(B).

[33] Van Hawk requested an early trial pursuant to this rule on March 23, 2023. Seventy days from that date was June 1. The trial court initially set the trial for April 25, which was well within the 70-day deadline. But on April 3, Van Hawk, by counsel, moved to vacate the trial date and acknowledged that Van Hawk had been released from jail, "and therefore, is no longer entitled to a Fast and Speedy Trial." App. Vol. II, p. 70. The trial court granted the motion and set a pretrial conference for April 24. However, at that conference, where both Van Hawk and his counsel appeared, counsel asked the court to schedule another pretrial conference for June 12—11 days beyond the June 1, 70-day deadline. The court noted on its pretrial conference memo, signed by both Van Hawk and his counsel, that Van Hawk "accepts the delay for [Criminal Rule 4] purposes." *Id.* at 75.

---

[4] Criminal Rule 4 was amended effective January 1, 2024, while Van Hawk's case was pending. Order Amending the Rules of Crim. Proc., No. 23S-MS-10 (Ind. June 23, 2023). We apply the prior version of Criminal Rule 4, which was in effect at the time of Van Hawk's motion, but note that the changes are immaterial to Van Hawk's arguments. We observe, however, that prior versions of the rule referred to "discharge," whereas the current version refers to "dismissal." *See Grimes v. State*, 235 N.E.3d 1224, 1230 (Ind. 2024) (noting the change in language in Criminal Rule 4(B) but holding that the Court's opinion was equally applicable under the old and newer versions of the rule).

[34] Van Hawk's argument that the trial court should have granted his motion for discharge fails for two reasons. First, Van Hawk was represented by counsel when he agreed to the vacation of the April 25 trial date and the setting of a pretrial conference beyond the 70-day deadline. It is well-settled that "if a defendant is represented by counsel, the defendant speaks to the trial court through that counsel." *Flowers v. State*, 154 N.E.3d 854, 867 (Ind. Ct. App. 2020). And a defendant who "seeks or acquiesces to the setting of a hearing beyond the time limitations of Criminal Rule 4(B) necessarily agrees to be tried beyond such date." *Talbott v. State*, 204 N.E.3d 288, 299 (Ind. Ct. App. 2023) (citing *Goudy v. State*, 689 N.E.2d 686, 691 (Ind. 1997)). Also, Van Hawk agreed to the setting of a pretrial conference 11 days after the 70-day clock would have expired. *See, e.g*, *Goudy*, 689 N.E.2d at 691 (holding that "defendant waived his earlier speedy trial request by acquiescing in the setting of an omnibus date, and by necessary implication, a trial date, beyond the seventy day limit permitted by Criminal Rule 4(B)(1)").

[35] Second, contrary to Van Hawk's assertions, he was not eligible for discharge under Criminal Rule 4(B) because he was on home detention, and not "in jail," while the 70-day clock was ticking. Crim. Rule 4(B)(1). This Court has previously rejected the argument that home detention is equivalent to incarceration in prison. *See, e.g.*, *Barton v. State*, 598 N.E.2d 623, 624 (Ind. Ct. App. 1992) (stating, unlike confinement in jail, "[h]ome detention allows defendants to live at home, work or seek employment, receive medical

treatments, go to school, and attend church services"); *Molden v. State*, 750 N.E.2d 448, 451 (Ind. Ct. App. 2001) (concluding, for purposes of awarding jail credit time, "time spent in pretrial home detention is not equivalent to pretrial time served in a prison or jail").

[36] Given the foregoing, Van Hawk was not entitled to discharge under Criminal Rule 4(B). Thus, the trial court did not violate his right to a speedy trial under that rule.

## 2. Criminal Rule 4(C)

[37] Next, Van Hawk maintains he should have been discharged based on the State's failure to bring him to trial within one year of the date he was charged, as required by Criminal Rule 4(C). That Rule states in relevant part:

> No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar[.]

Crim. R. 4(C).

[38] Van Hawk focuses on the Level 5 felony stalking charges that were ultimately alleged in Counts II and III of this case, arguing that the Criminal Rule 4(C) time period for those counts began in March 2021, when the charges were

originally filed under Cause Numbers 43C01-2103-F5-281 ("F5-281") and 43C01-2103-F5-282 ("F5-282"), respectively. Van Hawk accuses the State of dismissing the March 2021 charges and then refiling them "to evade" his speedy trial request. Appellant's Br., p. 27. However, Van Hawk's accusations are unavailing, as a review of the chronological case summaries ("CCS") for the respective causes indicates that Van Hawk caused a significant amount of delay and confusion by his own acts, such that the State, effectively, could not bring him to trial within the 1-year period.

[39] For instance, in F5-281, between March 2021 and March 2023, Van Hawk: (1) failed to appear for a pretrial conference, causing a delay of around 2½ months; (2) sought and was granted numerous continuances, both by counsel and acting pro se; and (3) had four attorneys in succession withdraw from representing him. Additionally, he filed a motion requesting a change of judge, a federal writ of habeas corpus, and numerous sundry pro se motions.

[40] In F5-282, matters progressed similarly. During the same timeframe, Van Hawk: (1) failed to appear for a pretrial conference; (2) filed numerous continuances; (3) had five attorneys in succession withdraw from representing him; and filed many sundry pro se motions.

[41] In its order denying Van Hawk's motion for discharge under Criminal Rule 4(C), the trial court noted that the "record in [F5-281 and F5-282] is chaotic and confusing, but the delays caused by [Van Hawk's] continuances [and] procedural challenges" amounted to "at least 16 delays" in each of the causes.

App. Vol. II, p. 137. Indeed, the CCS for the causes reveals that Van Hawk was responsible for an overwhelming amount of delay in bringing him to trial. Therefore, he was not entitled to discharge under Criminal Rule 4(C).

[42] Likewise, Van Hawk was not entitled to discharge in this case, F5-214, as the delays were attributable to him. On March 22, 2023, the State charged Van Hawk in F5-214 with the offenses that would become the instant Level 5 stalking Counts I, II, and III. The trial court granted his speedy trial motion and set his trial to begin on April 25, thus beginning the clock for Criminal Rule 4(C) purposes. The time, however, was tolled on April 3, after Van Hawk successfully moved to vacate the April 25 trial date. And the time did not begin to accrue again until 70 days later, on June 12, when the court held a pretrial conference at Van Hawk's request.

[43] Thereafter, the Criminal Rule 4(C) period was tolled for an additional 114 days, between June 12 and October 4, 2023, because Van Hawk became dissatisfied with his legal representation. This led to the withdrawal of two of his attorneys in succession, and accordingly, further rescheduling. After resetting Van Hawk's trial to September 26, the court had to reset it again to October 17 and noted in its written order that the delay was attributable to Van Hawk. In a subsequent order issued on October 4, the trial court vacated the October 17 trial date so it could appoint new counsel for Van Hawk, and the court again

noted that the delay was attributable to Van Hawk.[5] And to the extent Van Hawk argues the trial court failed to "make adequate record entries regarding the reasons for delay," his claim lacks merit. Appellant's Br., p. 28.

[44] Based on these delays, the 1-year time period to bring Van Hawk to trial was extended by 184 days, to September 22, 2024. Van Hawk's jury trial began on September 10, 2024, before the Criminal Rule 4(C) period had run. However, Van Hawk—by then proceeding pro se—told the court he was unable to participate in the trial. He requested and was granted a continuance so he could obtain a live transcriptionist for his trial due to his dissatisfaction with the court-provided accommodations for his hearing impairment. Thus, the 28 days between September 10 and October 8, 2024—the date Van Hawk's rescheduled trial began—further tolled the Rule 4(C) period.

[45] In total, 565 days passed between the date Van Hawk was charged in F5-214 and the beginning of his October 2024 trial; and all but 353 of those days were tolled for Criminal Rule 4(C) purposes. Therefore, Van Hawk was not entitled to discharge under that rule.

---

[5] Between November 24, 2023, and January 19, 2024, Van Hawk pursued an interlocutory appeal of the trial court's denial of his motion for dismissal, which further delayed his case. *See United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) ("A defendant who resorts to an interlocutory appeal normally should not be able upon return to the district court to reap the reward of dismissal for failure to receive a speedy trial.").

## B. Constitution-Based Speedy Trial Rights

[46] Van Hawk also asserts that the significant delay in his case violated his constitutional right to a speedy trial under both the United States and Indiana Constitutions. The Sixth Amendment to the United States Constitution guarantees the accused in all criminal prosecutions "the right to a speedy and public trial[.]" Article 1, Section 12 of the Indiana Constitution provides: "Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." We resolve both state and federal speedy trial claims by applying the analysis required by *Barker v. Wingo*, 407 U.S. 514 (1972); *S.L. v. State*, 16 N.E.3d 953, 961 (Ind. Ct. App. 2014).

[47] In *Barker*, the United States Supreme Court identified four factors to balance in determining whether a defendant has been deprived of the speedy trial right: (1) length of the delay; (2) reason(s) for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant. 407 U.S. at 530.

### 1. Length of Delay

[48] The State charged Van Hawk in March 2023, and the trial court held his jury trial 565 days later, in October 2024. "Delays approaching one year generally" are considered to be "presumptively prejudicial." *Watson*, 155 N.E.3d at 617. This approximately 18-month delay is sufficient to trigger the *Barker* analysis. *See id.* at 616-17.

## 2. Reason for Delay

Next, we assess "who is more responsible for the delay: the government or the defendant." *Id.* at 617 (citing *Doggett v. United States*, 505 U.S. 647, 651 (1992)). "Reasons for delay generally fall into three categories: (1) justifiable, like a missing witness; (2) neutral, like negligence or court congestion; or (3) bad faith, like a purposeful attempt to hinder the defense." *Id.* (citing *Barker*, 407 U.S. at 531). "Only those reasons falling in the latter two categories weigh against the government, with one grounded in bad faith weighing most heavily." *Id.* (citing *Barker*, 407 U.S. at 531). "On the other side of the scale, any delay caused by the defense falls on the defendant." *Id.* (citing *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)).

Although the delay here was approximately 18 months, the reasons for the delay are attributable largely to Van Hawk. As previously discussed, he repeatedly dismissed his counsel, causing newly appointed counsel to seek continuances and the trial court to reset pretrial conferences as well as his jury trial date. He also sought an interlocutory appeal. And while represented by counsel, he filed numerous pro se pleadings. Therefore, this *Barker* factor weighs against Van Hawk.

## 3. Assertion of Right

We next examine "whether and how a defendant asserted the speedy trial right." *Watson*, 155 N.E.3d at 618 (citing *Barker*, 407 U.S. at 531). Our inquiry "is a fluid one: we determine whether the State and court were put on notice

that a defendant has asserted their speedy trial right, while remaining mindful of any conduct by the defendant to the contrary." *Id.* (citing *United States v. Loud Hawk*, 474 U.S. 302, 314 (1986)).

[52] Although Van Hawk promptly requested a speedy trial, less than two weeks later, he asked the trial court to vacate the trial date. The string of counsel appointed to represent him necessitated counsel to seek multiple continuances. Through counsel and acting pro se, Van Hawk filed motions for discharge and a motion for dismissal, despite also repeatedly causing his trial to be delayed. However, because he consistently asserted his speedy trial rights under Criminal Rule 4, this was sufficient to put the trial court on notice regarding his constitutional speedy trial rights. This factor, thus, favors Van Hawk.

## 4. Prejudice

[53] Finally, we assess the prejudice that Van Hawk suffered as a result of the delay. "We assess prejudice in light of the three interests the speedy trial guarantee was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Watson*, 155 N.E.3d at 619 (citing *Barker*, 407 U.S. at 532). The most important of the three is limiting the possibility of defense impairment. *Barker*, 407 U.S. at 532. It is the defendant's burden to show actual prejudice because of the delay. *Johnson v. State*, 83 N.E.3d 81, 87 (Ind. Ct. App. 2017).

Van Hawk's only claims of prejudice are that his home detention and GPS monitoring while awaiting trial amounted to a "significant restriction on his liberty," and the delay in bringing him to trial increased his anxiety. Appellant's Br., p. 31. While he may have waited roughly 18 months for trial and suffered some anxiety, he was not in jail during that time, and his own actions caused the majority of the delays. In addition, he makes no argument regarding the most important factor, that the delay undermined or impaired his defense. Indeed, many of the delays appear to have aided Van Hawk's defense, either by giving new counsel time to prepare or allowing for accommodations for Van Hawk's hearing impairment. Accordingly, we find this factor weighs against Van Hawk.

In balancing the *Barker* factors—and considering that Van Hawk caused the majority of the delays and failed to show he was prejudiced—Van Hawk is not entitled to relief under *Barker*. Therefore, his constitutional right to a speedy trial under the United States and Indiana constitutions was not violated.

## II.   Right to a Fair Trial

We now turn to Van Hawk's claims that the trial court denied him a fair trial by: (A) refusing to sever the charges; (B) failing to accommodate his hearing impairment; (C) deeming his waiver of counsel valid and denying him standby counsel; (D) providing inadequate notice of the trial date; and (E) restricting his presentation of evidence. We address each argument and affirm.

## A. Joinder and Motion to Sever

[57] Van Hawk argues that he was entitled to a severance of the three Level 5 felony stalking charges as a matter of right, and alternatively, even if he had no right to a severance, the trial court abused its discretion in denying his motion to sever. However, he failed to renew his motion at trial as required by Indiana Code § 35-34-1-12(b). Consequently, the State correctly argues that he has waived the matter for appeal. *See Ennik v. State*, 40 N.E.3d 868, 875 (Ind. Ct. App. 2015) (issue of defendant's request for separate trial was waived on appeal where his pretrial motion for severance was denied, and he failed to renew motion during trial). Waiver notwithstanding, we find his arguments unpersuasive.

[58] Two or more offenses may be joined in the same charging information when they are either of the same or similar character or constitute part of a single scheme or plan. Ind. Code § 35-34-1-9(a). After causes are joined, a defendant's right to severance will vary on the basis for joinder:

> Where the offenses have been joined *solely* because they are of the same or similar character, a defendant is entitled to severance as a matter of right. The trial court thus has no discretion to deny such a motion, and we will review its decision de novo. But where the offenses have been joined because the defendant's underlying acts are connected together, we review the trial court's decision for an abuse of discretion.

*Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015) (internal citations omitted).

[59] When a defendant is not entitled to severance as a matter of right, the court

> shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> > (1) the number of the offenses charged;
> >
> > (2) the complexity of the evidence to be offered; and
> >
> > (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

Ind. Code § 35-34-1-11(a).

[60] Van Hawk first argues that he is entitled to severance of the charges as a matter of right under Indiana Code § 35-34-1-9(a), claiming the charged offenses were joined "solely because they are of the same or similar character" and because the charges "concern vastly different time periods" and "lack the necessary temporal and factual nexus to be considered 'connected together.'" Appellant's Br., pp. 35, 36. In determining whether joined offenses are connected by the defendant's "underlying acts" and are not merely of the "same or similar character," "we ask whether the operative facts establish a pattern of activity beyond mere satisfaction of the statutory elements." *Pierce*, 29 N.E.3d at 1264, 1266. A defendant's "modus operandi" and "motive" are relevant to determining whether charges are connected by the defendant's underlying acts and are not merely similar in character based on the statutory elements. *Id.* at 1266.

Here, the record reveals that Van Hawk's stalking charges were not joined solely because they were of the same or similar character. Although the charges stemmed from different time periods, they were all based on a pattern of activity and the modus operandi of Van Hawk repeatedly contacting and harassing his ex-wife—by email, text messages, lawsuits, bizarre antics, and in-person contacts—in violation of multiple protective orders. The charges were also united by Van Hawk's motive of harassing N.V. over the choices she made for the couple's children. As such, Van Hawk was not entitled to severance as a matter of right.

In the alternative, Van Hawk contends severance was appropriate under Indiana Code § 35-34-1-11(a) "to promote a fair determination" of his "guilt or innocence of each offense." As noted supra ¶ 60, this provision requires consideration of "(1) the number of offenses charged; (2) the complexity of the evidence to be offered; and (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." *Id.* A trial court has discretion in weighing these factors, and we review the court's decision only for an abuse of that discretion. *Pierce*, 29 N.E.3d at 1264. A defendant seeking reversal based on the denial of severance must show that, given what actually occurred at trial, the denial was prejudicial. *Harvey v. State*, 719 N.E.2d 406, 409 (Ind. Ct. App. 1999).

Van Hawk argues the "cumulative impact of three separate charges spanning multiple years likely created a prejudicial impression of persistent wrongdoing

that would not have existed had the charges been tried separately." Appellant's Br., p. 38. We disagree. The State charged Van Hawk with three counts of Level 5 felony stalking and amended the charges such that each count spanned a different and distinct time period. Van Hawk has not identified anything particularly complex regarding the counts, demonstrated that the jury had trouble distinguishing the evidence and applying the law intelligently to each offense, or shown he was prejudiced by the denial of the motion for severance. See Vasquez v. State, 174 NE.3d 623, 631 (Ind. Ct. App. 2021) (trial court did not abuse its discretion by denying motion for severance when the evidence was not complex and could be distinguished by jury). Therefore, the trial court did not abuse its discretion when it denied Van Hawk's motion to sever.

## B.    Hearing Impairment Accommodation

[64]    Next, Van Hawk argues he was unable to be "fully present and involved" in his trial because the trial court failed to provide him with an effective accommodation for his hearing impairment. Appellant's Br., p. 41. During trial, from start to finish, he repeatedly objected to the closed captioning system the court provided, arguing that the system was failing him in three ways: (1) it did not identify the speakers, making it "impossible" for him to know who was speaking at any given time; (2) it did not include a feature allowing him to scroll up and review prior statements and testimony; and (3) the automatic transcription made typographical errors. *Id.* at 40.

[65]    On appeal, Van Hawk claims a violation of due process on grounds that the court-provided system did not meet the standards set by The Americans with

Disabilities Act of 1990 (ADA) (42 U.S.C. § 12132); his numerous objections to the system were ignored by the court; and the court wrongfully placed the burden on him to secure a real-time transcriptionist for his trial. Where, as here, a party claims that he was denied due process, we review the matter de novo. *Hilligoss v. State*, 45 N.E.3d 1228, 1230 (Ind. Ct. App. 2015).

[66] Under the ADA, a public entity is prohibited from discriminating against any individual with a disability because of that disability. 42 U.S.C. § 12132. Regarding communications for a disabled individual, the implementing regulation of the ADA provides in relevant part that the "type of auxiliary aid or service necessary to ensure effective communication" varies based on the "method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). In deciding "what types of auxiliary aids and services are necessary," it is imperative to give "primary consideration to the requests of individuals with disabilities." *Id.*

[67] Appropriate "[a]uxiliary aids and services" include:

> Qualified interpreters on-site or through video remote interpreting (VRI) services; . . . real-time computer-aided transcription services; . . . telephone handset amplifiers; assistive listening devices; assistive listening systems; . . . closed caption decoders; open and closed captioning, including real-time captioning; . . . videotext displays; . . . or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing[.]

28 C.F.R. § 35.104. The "auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2).

[68] Early in the proceedings, the trial court arranged amplification devices and real-time closed captioning for Van Hawk's hearing impairment based on a recommendation from the Indiana Supreme Court's Office of Judicial Administration. Despite being afforded a reasonable accommodation approved by our Supreme Court and the ADA, Van Hawk insisted on other technology. The court did not deny his request, telling Van Hawk: "You get me the information on the device that you want and I'll arrange to have it. I don't know what more I can do for you. I'll give you what you ask for." Tr. Vol. II, p. 19. Yet Van Hawk did not provide the information to the court. Later in the proceedings, the court "updated" the accommodation to a different real-time closed captioning computer program, noting that the program appeared to be "at least 95 percent or plus accurate." *Id.* at 85, 90.

[69] When the jury trial commenced on September 10, 2024, Van Hawk told the court he could not "hear what's happening" and requested a continuance to obtain a live transcriptionist. *Id.* at 223. The court granted the continuance and directed Van Hawk to promptly provide the name of the service and verify its availability, but he failed to do so. One week later, the trial court ordered Van Hawk to arrange for transcription services if he wished to use them. But he did

not provide the information the court previously had requested. And on October 8, 2024, when his rescheduled jury trial began, he proceeded to trial and did not request a continuance to allow himself time to arrange for a live transcriptionist.

[70] Van Hawk has not established that the trial court failed to accommodate his hearing impairment. The record reveals that during the jury trial, Van Hawk questioned witnesses, lodged objections, and addressed the court and the jury. Though he repeatedly complained about the court-provided accommodations for his hearing impairment, he failed to follow the court's directive to provide the court with the pertinent information for the transcription service of his choice. And while there were imperfections in the computer-aided transcription, we are satisfied from our review of the record that those imperfections were limited and did not interfere with Van Hawk's ability to be fully present and involved in his trial. Therefore, Van Hawk's due process right to a fair trial was not violated.

## C.    Waiver of Counsel and Denial of Standby Counsel

[71] Next, Van Hawk argues that the trial court "conducted an inadequate inquiry" regarding whether he made a knowing, voluntary, and intelligent waiver of his right to counsel. Appellant's Br., p. 44. He contends the record is silent as to whether he was sufficiently advised about the perils of self-representation.

[72] Both the United States and Indiana Constitutions guarantee a criminal defendant the right to representation by counsel. U.S. Const. amends. VI, XIV;

Ind. Const. art. 1, § 13. Implicit in the right to counsel is the right to self-representation. *See Faretta v. California*, 422 U.S. 806, 807 (1975). A defendant's assertion of the right of self-representation must be "unequivocal." *Wright v. State*, 168 N.E.3d 244, 259 (Ind. 2021). "We review de novo a trial court's finding that a defendant waived his right to counsel." *Butler v. State*, 951 N.E.2d 255, 260 (Ind. Ct. App. 2011).

[73] When a criminal defendant waives his right to counsel and elects to proceed pro se, we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary. *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). "Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* Among the factors we consider are:

> (1) the extent of the court's inquiry into the defendant's decision[;] (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation[;] (3) the background and experience of the defendant[;] and (4) the context of the defendant's decision to proceed pro se.

*Poynter v. State*, 749 N.E.2d 1122, 1127 (Ind. 2001) (quoting *United States v. Hoskins*, 243 F.3d 407, 411 (7th Cir. 2001)).

[74] There are no prescribed "talking points" the court is required to include in its advisement to the defendant; it need only come to a considered determination

that the defendant is making a voluntary, knowing, and intelligent waiver. *Id.* at 1126. The defendant should be made aware of the dangers and disadvantages of self-representation so the record will establish that he knows what he is doing and his choice is made "with eyes open." *Leonard v. State*, 579 N.E.2d 1294, 1295 (Ind. 1991) (citing *Faretta*, 422 U.S. at 835). Because a trial court is uniquely situated to assess whether a defendant has waived the right to counsel, we will most likely uphold the trial court's decision "to honor or deny the defendant's request to represent himself." *Wright*, 168 N.E.3d at 255.

[75] Here, the trial court noted in its May 2024 amended order that Van Hawk had been given a waiver of counsel document setting forth an extensive advisement for individuals seeking to represent themselves. The document explained that Van Hawk had the right to counsel as well as the right to represent himself. It outlined in detail the benefits and skills an attorney would provide, specifically, evaluating the strengths and weaknesses of the case, investigating the case, explaining the charges, gathering evidence, examining and cross-examining witnesses at trial, recognizing "objectionable and unfavorable" evidence, presenting "favorable opening and closing statements," preparing jury instructions, and selecting the jury. App. Vol. III, p. 206. The document stated that by proceeding pro se, Van Hawk would not receive "any special treatment" with his defense and would have to follow "all the same rules and procedures" as an attorney would. *Id.* The document further provided that if Van Hawk decided to proceed pro se, "and the result turns out badly," he would not "be able to complain" that he was not an "effective attorney." *Id.* Additionally, the

document advised that proceeding pro se "can turn out to be a very bad decision." *Id.*

[76] The document also contained several questions Van Hawk should ask himself before deciding to proceed pro se, such as the skills and knowledge he had that would help him in his self-representation; whether he had ever studied criminal law; his previous experience with the criminal justice system; whether he had participated in a jury trial; and his education level, his ability to read and write well, and his oratory skills.

[77] After providing Van Hawk with the waiver of counsel document, the trial court—at a status conference held in September 2024—again considered Van Hawk's decision to waive his right to counsel and proceed pro se. And during the status conference, the court engaged Van Hawk in extensive discourse about proceeding pro se. First, the court informed Van Hawk that his "last attorney" had withdrawn his appearance. Tr. Vol. II, p. 159. And when the court then asked him how he wanted to proceed, Van Hawk replied, "Let's proceed with the jury selection. Let's get this done." *Id.* at 160.

[78] The court asked Van Hawk multiple times if he wanted an attorney. After much back and forth, where Van Hawk often talked over the court, Van Hawk stated: "I have the right to represent myself. That's my constitutional right." *Id.* at 167-68. The court noted that Van Hawk possessed "the intelligence" to represent himself. *Id.* at 168. And as the court attempted to question Van Hawk about the intricacies of a jury trial, including selecting a jury, Van Hawk told the court:

"I've requested to represent myself, as is my constitutional right. If you have a problem with the way, I'm doing it when it proceeds. That's another story." *Id.* at 169. The court then explained to Van Hawk that he would have to follow "the decorum in the courtroom," and would be responsible for jury selection, opening statements, questioning witnesses, and lodging objections. *Id.* at 170.

[79] The court also told Van Hawk that if he "want[ed] to proceed pro se," he needed to reread the waiver of counsel document and, after "contemplat[ing] it," sign and date it. *Id.* at 177. Van Hawk told the court, "I've read it, your honor. I've seen it." *Id.* The court stated, "Those warnings have been given to you. You've told me you've considered them. You told me you want to risk representing yourself." *Id.*

[80] The court also attempted to dissuade Van Hawk from self-representation and persuade him that he could not effectively do so, telling Van Hawk, "I do think it's a mistake for you to represent yourself. A serious mistake but okay." *Id.* at 175. And the court tried to continue the jury trial and find an attorney to represent Van Hawk, but Van Hawk told the court, "I'm representing myself. . . . I will not accept another attorney. It's my right to represent myself." *Id.* at 179-80. The court told Van Hawk to sign the waiver of counsel document, and he did so, thus, acknowledging he had read the advisements. Though Van Hawk now disputes that he signed the waiver and claims it was not included in the appellate record, the waiver is indeed included in the record, bearing his signature and dated September 4, 2024. *See* App. Vol. III, p. 226-27.

[81] Van Hawk attempts to shift the blame for his proceeding pro se entirely onto the trial court. Yet, the record reveals that Van Hawk fired all of his attorneys and insisted on representing himself—even after extensive warnings from the trial court against proceeding pro se—only hesitating or expressing doubt about his choice when his trial did not appear to be progressing as he had hoped. Van Hawk was informed of the self-representation warnings and advisements in writing, then verbally at the September 4, 2024, status conference, and then again in writing during the status conference. And that same day, he signed the waiver of counsel document.

[82] The facts and circumstances presented in this case establish that the trial court conducted an adequate inquiry and properly determined that Van Hawk knowingly, voluntarily, and intelligently waived his right to counsel. Thus, the trial court did not err in allowing him to proceed pro se.[6]

[83] As for Van Hawk's argument that the trial court abused its discretion by denying him standby counsel when it was "plainly warranted," we are not persuaded. Appellant's Br., p. 45. A defendant who proceeds pro se has no right to demand the appointment of standby counsel for assistance. *Kindred v. State*,

---

[6] We note that, in his reply brief, Van Hawk raises new arguments to support his contention that he did not make a knowing, voluntary, and intelligent waiver of counsel. He claims his refusal to file a pro se appearance, as required under Indiana Criminal Rule 1.3(C), and the fact that he wrote "under duress" beneath his signature on the waiver of counsel document, established that he did not choose to represent himself but, instead, was forced to do so. Reply Br., p. 17. However, because Van Hawk raises these issues for the first time in his Reply Brief, they are waived. *See Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011) (citing Appellate Rule 46(C) and explaining that party "may not raise an issue . . . for the first time in a reply brief").

521 NE.2d 320, 323 (Ind. 1998). Rather, the decision is within the trial court's discretion. *Id.*

[84] We acknowledge Van Hawk's lack of familiarity with the nuances of a criminal trial, as well as the use of standby counsel to eliminate the disadvantages associated with pro se representation. *See Wilson v. State*, 94 N.E.3d 312, 324 (Ind. Ct. App. 2018) (appointment of standby counsel can be an appropriate prophylactic device when a defendant assumes burden of conducting his own defense). However, in this case, Van Hawk rejected court-appointed counsel, rejected the trial court's repeated offers to appoint counsel, insisted on self-representation, and exhibited a fierce determination to represent himself at trial, notwithstanding the trial court's warnings about the risks of proceeding pro se. Under these circumstances, we cannot say that the trial court abused its discretion by denying his request for standby counsel.

## D. Notice of Jury Trial

[85] Next, Van Hawk contends that the trial court violated his right to due process by advancing his jury trial date from November 19, 2024, to October 8, leaving him insufficient time to file pretrial motions, submit proposed jury instructions, address evidentiary matters, and arrange for a live transcriptionist at his trial. He maintains that the advanced trial date amounted to "a sort of procedural ambush" and provided a "one-sided advantage to the State." Appellant's Br., pp. 47, 48. We review a party's claim that he was denied due process de novo. *Hilligoss*, 45 N.E.3d at 1230.

[86] At the September 17, 2024, status conference, the trial court attempted to reschedule Van Hawk's jury trial for December, but Van Hawk rejected the date, stating: "this is ridiculous" and "it's not even remotely acceptable." Tr. Vol. II, p. 234. The court then orally set the trial for November 19 and 20 and directed Van Hawk to have his chosen live transcription service contact the court. However, when an earlier trial date became available—and in light of the deep dissatisfaction that Van Hawk expressed with the December trial date—the court issued a written order on September 17, rescheduling the trial to October 8. The court sent the order to Van Hawk by email on September 18 and had the sheriff serve him with the order on September 27. And though the order noted the court had "found on several prior occasions" that the existing accommodations the court had provided for Van Hawk's hearing impairment were reasonable, it directed Van Hawk to arrange for transcription services if he wished to use them for the October 8 trial. App. Vol. IV, p. 10. Van Hawk did not file an objection to the new trial date.

[87] Instead, at the start of the October 8 trial, Van Hawk complained that he did not receive notice of the rescheduled trial date until he was served with the order on September 27, and he informed the court that he had contacted the transcription service about the November 19 date, not the October 8 date. Yet, when the court asked if he "was making a motion to continue the trial," Van Hawk replied, "No, your honor," and the trial commenced. Tr. Vol. III, p. 7.

[88] Because Van Hawk chose to proceed to trial as scheduled rather than request a continuance, he cannot now complain that his right to due process was violated and he was denied a fair trial. Thus, no error occurred here.

## E.    Presentation of Evidence

[89] Next, Van Hawk contends that he was denied a fair trial and "the opportunity to present a full defense" because the trial court cut short his cross-examination of his ex-wife, N.V.; the presentation of his testimony during his case-in-chief; and his closing argument. Appellant's Br., p. 51. We first note that Van Hawk has failed to develop and present cogent arguments that the trial court unfairly limited his ability to present his testimony and his closing argument. Therefore, he has waived these issues for review. *See Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that defendant waived argument on appeal by failing to develop cogent argument); *see also generally* Ind. Appellate Rule 46(A)(8)(a) (providing that an appellant's brief "must contain the contentions of the appellant on the issues presented, supported by cogent reasoning").

[90] Turning to Van Hawk's remaining cross-examination argument, we find he has waived it as well by failing both to preserve the issue at trial and to present a cogent argument on appeal.

[91] After allowing Van Hawk to cross-examine N.V. at length, the court told him that he had asked only a handful of "legitimate questions," had "badgered the witness, . . . assumed facts that [we]re not in evidence, and . . . wasted [the court's] time[.]" Tr. Vol. III, p. 232. The court warned Van Hawk that it would

terminate his cross-examination if he did not ask "legitimate questions" related to the substance of N.V.'s testimony or her credibility. *Id.*

[92] The State sought to end the questioning pursuant to Indiana Evidence Rule 611, which provides that courts "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence," with an aim to "(1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." And, per the Rule, the scope of cross-examination "should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Evid. R. 611.

[93] Here, the trial court allowed Van Hawk to continue with his cross-examination for about ten minutes after its warning. Then, the court granted the State's request to terminate the cross-examination, telling Van Hawk:

> Yes, the time limit is when you waste our time. When you bring up issues that are not relevant. When you badger the witness. When you assume facts that are not in evidence and this actually (sic) when you should be proving this in your case. I don't see how we've gotten anywhere in any of this timeframe and it's, it's been nonproductive. I grant the State's request. I terminate this cross-examination. You may have a seat sir.

Tr. Vol. III, pp. 241-42. The court found that "every part of Rule 611 applies," because, in addition to badgering the witness and wasting time, Van Hawk's cross-examination had gone "beyond the scope of the direct examinations." *Id.* at 242.

[94] On appeal, Van Hawk does not challenge the trial court's Rule 611 ruling, per se. Instead, he frames his argument as a violation of his constitutional right to confront witnesses by terminating his cross-examination of N.V. The Confrontation Clause of the Sixth Amendment to the United States Constitution specifies that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is made applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). "The essential purpose of the Sixth Amendment right of confrontation is to ensure that the defendant has the opportunity to cross-examine the witnesses against him." *Howard v. State*, 853 N.E.2d 461, 465 (Ind. 2006). We review constitutional challenges de novo. *Ackerman v. State*, 51 N.E.3d 171, 177 (Ind. 2016), *cert. denied.*

[95] But, as noted supra ¶ 90, Van Hawk has waived his confrontation claim in two ways. First, as the State points out, he did not raise a Sixth Amendment objection at trial. *See Small v. State*, 736 N.E.2d 742, 747 (Ind. 2000) (defendant waived confrontation issue where his trial objection was based solely on other grounds). Second, on appeal, his confrontation argument is perfunctory at best and insufficient to merit appellate review. For instance, he does not flesh out his argument; instead, he baldly asserts that the trial court's "termination of [his] cross-examination of the alleged victim on the basis that 'time is up' and that the questioning was 'non-productive' violated his constitutional right to confront witnesses against him[.]" Appellant's Br., p. 50.

We will not become an advocate for an appellant by supplementing an argument lacking essential analysis. *Rodts v. Heart City Auto., Inc.*, 933 N.E.2d 548, 554 (Ind. Ct. App. 2010); *see also Keller v. State*, 549 N.E.2d 372, 373 (Ind. 1980) (observing that a court runs the risk of being an advocate rather than an adjudicator when it searches the record and makes up its own arguments because a party presented them in a perfunctory manner). Given the dearth of Van Hawk's Confrontation Clause analysis, he has waived this claim. *See* App. R. 46(A)(8)(a).

## F. Cumulative Error

Finally, Van Hawk argues that the "cumulative effect of the trial court's decisions created a perfect storm that rendered [his] trial fundamentally unfair." Appellant's Br., p. 52. However, because we have concluded that there was no error in the trial court's rulings on the speedy trial motions, severance, accommodations, waiver of counsel and standby counsel, notice of trial, or presentation of evidence and trial management, we also conclude that there was no cumulative error.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

Bradford, J., and DeBoer, J., concur.

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana